[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 3, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14294

_____

D. C. Docket No. 05-01754-CV-BBM-1

LAURA SKOP,

Plaintiff-Appellant,

versus

CITY OF ATLANTA, GA,
OFFICER TIMOTHY BROWN, in his individual capacity,
SERGEANT THOMAS L. PADGETT, in his individual
capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 3, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

_____

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting
by designation.

MARCUS, Circuit Judge:

This § 1983 civil rights case presents the question whether Timothy Brown, an Atlanta police officer, was entitled to qualified immunity for his arrest of Laura Skop, a woman who asked him to move his patrol car so that she could access her driveway during a heavy thunderstorm. The district court entered summary judgment for Officer Brown, who was blocking the street because a fallen tree had downed some utility lines, on the grounds that he had arguable probable cause to make the arrest. After thorough review, we reverse the district court's entry of final summary judgment for Brown and remand Skop's claims against him for further proceedings. As for Skop's claims against Sergeant Padgett, Brown's supervisor, and the City of Atlanta, however, we affirm the district court's entry of summary judgment.

### I. Factual and Procedural History

Taking the evidence in the light most favorable to Laura Skop ("Skop"), the appellant, as we are required to do in reviewing the district court's summary judgment order, the essential facts are these. Skop drove home after work during a summer thunderstorm in Atlanta on the evening of July 10, 2003. She arrived home to find the entrance to her driveway blocked, although only by about a foot,

2

by the patrol car of Officer Timothy Brown ("Brown"), appellee, of the Atlanta Police Department (APD). Brown had parked his patrol car diagonally across the street to block traffic; an earlier storm had knocked down a large tree on Skop's street, and several utility lines had been downed by the tree. The downed tree was some 110 feet from Skop's driveway. Brown was parked diagonally across the street, with the driver's side of his car angled down the street towards the downed tree. Brown was sitting inside the patrol car, doing some paperwork and observing the scene. Only the rear passenger quarter of Brown's patrol car was blocking Skop's driveway; the area of the street that Brown was obstructing lay farther down the street, beyond Skop's home.

Not surprisingly, Skop wanted to park in her garage, which was located behind an electronic gate and attached to her home, for reasons of personal security and on account of the storm. When she realized that she could not get past Brown's patrol car, she used her turn signal to indicate that she was seeking to get into the driveway. The patrol car did not move. Skop then honked her horn, and again failed to elicit any response. She could not see into the patrol car and was not even certain if there was an officer inside. She then rolled down her window on the passenger side -- the side of her car closest to the patrol car -- in an attempt to communicate with anyone inside. Officer Brown then rolled down the passenger-

3

side window of his patrol car, and Skop attempted to tell Brown that she needed to get into her driveway. Skop could not hear any response from Brown, and she assumed that he could not hear her, either.

Skop then exited her car and walked around to the driver's side of the patrol car. She stood outside the car and, when Brown did not acknowledge her, tapped on his rolled-up window. Before Skop was able to tell Brown that she wanted him to pull his car forward a foot or two to allow her access to her driveway, Brown rolled down his window and yelled at her that she was in a dangerous area. Without giving Skop a chance to respond, he rolled up his window and went back to his paperwork. The same thing happened again -- Skop tapped on the window, Brown rolled it down and yelled about the downed tree, and Brown rolled up his window before Skop could respond.

Frustrated, Skop mouthed a request for Brown's name and badge number at Brown through the closed window. At this, Brown jumped out of his car, slammed the door, and advanced on Skop. Skop tried to tell him that his car was blocking her driveway, both orally and by gesturing at her driveway. She said, "This is my driveway, can you please move up a foot?" and testified that she was "frantically pointing towards [her] driveway, saying, 'I live here, I just need you to move up a foot.'" Skop Depo. 75. According to Skop, Brown then yelled, "Do you realize I

4

can arrest you for obstruction?" Skop replied, "But this is my driveway. I just need to ask you to move up a foot." Id. at 76. Brown appeared angry and reached for his handcuffs as he advanced towards Skop, who backed away in fear and attempted to contact a neighbor. Brown then arrested Skop, handcuffed her, and placed her in the patrol car.

Brown claims that he was not aware that Skop wanted to enter her driveway, and instead believed that she wished to drive down to the end of the blocked street in the direction of the downed tree. Brown also testified that he had asked Skop to park her car at the curb and walk to the house, and that he did not learn where Skop lived until after her arrest. Notably, Skop denied ever hearing any instruction from Brown to park her car at the curb and walk to her home. See Civil Service Appeal Transcript 33–39; Skop Depo. 73–80. Indeed, she said that if she had been given any instruction from Brown she would have fully complied. Brown also admitted that Skop's tone was normal but "a bit demanding." He does not claim that she ever threatened him or even raised her voice.

Sometime after the arrest but before leaving the scene, Brown called Sergeant Thomas Padgett, the watch commander, to inform him of the arrest. Brown also requested permission to impound Skop's car, as required by APD regulations. Skop claims that Padgett suggested to Brown during this conversation

that Brown add on an additional charge -- refusing to obey an officer directing traffic. Doug Kollme, a neighbor of Skop's who had witnessed part of the arrest, asked Officer Brown if Brown would let him move Skop's car out of the street into her driveway and have her keys so that he could care for her dog. Skop, who was now handcuffed with her arms behind her back in the rear seat of the patrol car, also asked Brown if the neighbor could pull her car forward into the driveway. Brown refused both requests, and he decided to take Skop in for booking.

While Brown waited for the tow truck and a police van to transport Skop for booking, Skop says that Brown repeatedly yelled at her. See Skop Depo. 82–83 ("He got into the car -- he yelled at me. Said that I obstructed him. Said that I was going to jail. He was going to impound my car. . . . He continued to yell at me over and over again that I obstructed him. . . . I said I didn't obstruct you. But that made him angrier . . . .") When the tow truck arrived, Brown backed his patrol car into Skop's driveway, and Skop's car was towed away.

The police van was delayed, so Brown drove Skop to the police station to wait. Skop, who was kept handcuffed with her hands behind her back while in the police station, said she felt humiliated by the stares of passing male officers; her summer blouse had been soaked through by the heavy rain, and her breasts were visible through the wet fabric. The police van driver arrived at the station at about

6

10:00 p.m. and immediately removed the handcuffs. Skop was then taken to the Atlanta Pretrial Detention Center and detained until about 3:00 a.m.

Criminal charges were filed against Skop on the two misdemeanor counts of obstructing an officer, Ga. Code Ann. § 16-10-24, and refusing to obey an officer directing traffic, Ga. Code Ann. § 40-6-2. The charges were eventually dropped more than a year later, but, as of June 2006, she had been unable to expunge the arrest from her record. Skop said that she suffered a damaged rotator cuff and two herniated disks in her back during the arrest. She also claimed that she was fired from her job as a technology consultant when her employer became uncomfortable with the fact that her arrest appeared in background checks that she was required to undergo in order to work on security-sensitive projects for financial institutions.

The Atlanta Police Department began to investigate the incident shortly after it occurred. Joseph Spillane ("Spillane"), an APD major and the commander responsible for the area of the city where Skop lived, investigated the scene the day after Skop was arrested. Spillane spoke to Skop's neighbors, who were upset by Officer Brown's decision to arrest her when he could have simply pulled his car forward a few feet to allow her access to her driveway. On a subsequent occasion, Spillane asked Padgett, Brown's supervisor, to go to the scene with him. Spillane testified that he asked Padgett "how a woman could drive down the street and end

up being arrested when she simply wanted to pull in her driveway. I had concerns." Spillane Depo. 69. In response to the claim that Skop's driveway was somehow unsafe for her to enter, Spillane pointed to the fact that Brown himself had parked his patrol car in Skop's driveway, with Skop handcuffed in the back seat, while Skop's car was being towed from the scene.

Formal disciplinary proceedings were initiated against Officer Brown by the Atlanta Police Department. Following the conclusion of these proceedings, which involved an investigation including statements from Skop and a number of her neighbors, Brown received a written reprimand and a two-day suspension without pay for violating APD work rules. The APD's Notice of Final Adverse Action stated that Officer Brown had "abused [his] authority as a police officer when [he] arrested her . . . and impounded her vehicle."

Brown also received a written reprimand for violating departmental rules on courtesy when he behaved in a confrontational manner with Charles Schroeder, a neighbor of Skop's who attempted to interact with Brown following Skop's arrest. Schroeder had approached Officer Brown because he saw Skop's car abandoned in the street and was concerned. When Schroeder asked about Skop's abandoned car, Brown apparently told Schroeder that he had Skop in his custody, and that "[i]f you persist, I may arrest you next." Schroeder described Brown's behavior during

8

the encounter as "confrontational" and "threatening" and said that Brown made him "feel personally threatened and intimidated." APD Citizen Statement of Charles Schroeder (Doc. 42, Ex. 60).

Skop then filed a § 1983 civil rights suit in the United States District Court for the Northern District of Georgia on July 1, 2005. The complaint contained counts for false arrest and malicious prosecution in violation of the Fourth Amendment and named as defendants Officer Brown, Sergeant Padgett, and the City of Atlanta. After discovery and mediation, the defendants moved for summary judgment.

The district court entered final summary judgment for all defendants on August 4, 2006. Concerning Officer Brown, the district court reasoned that he had arguable probable cause to arrest Skop for obstruction and accordingly dismissed Skop's claims for false arrest and malicious prosecution. As for Sergeant Padgett, the district court determined that there was "simply no basis" for Skop's claims that Padgett discussed the arrest with Brown and helped him cover up the lack of probable cause by suggesting an alternative offense. Finally, as for the City of Atlanta, the district court did not address Skop's claim that a custom or policy of the city caused the alleged constitutional violation. Instead, the court entered summary judgment for the city, concluding that, since it had found that Brown had

9

arguable probable cause, there could be no constitutional violation. Skop timely appealed.

## II. **Qualified Immunity for Officer Brown**

Our review begins with the district court's entry of final summary judgment for Officer Brown on qualified immunity grounds. We review a district court's grant of summary judgment de novo. Kingsland v. City of Miami, 382 F.3d 1220, 1225 (11th Cir. 2004). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Kingsland, 382 F.3d at 1226; see also Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). In making a qualified immunity determination, we are similarly obliged to review the facts in the light most favorable to the plaintiff. Saucier v. Katz, 533 U.S. 194, 201 (2001); McClish v. Nugent, No. 06-11826, slip op. at 12 (11th Cir. Apr. 11, 2007).

Our qualified immunity analysis proceeds along these well-known lines. An official asserting the affirmative defense of qualified immunity must initially

10

establish that he was acting within his discretionary authority. If the official was acting within the scope of his discretionary authority -- and it is undisputed that Officer Brown was acting within the scope of his discretionary authority -- the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Overcoming the official's qualified immunity defense involves two steps. First, the plaintiff must establish that the defendant's conduct violated a statutory or constitutional right. Saucier, 533 U.S. at 201. Next, the plaintiff must show that the violation was "clearly established." Id. Although the first and second inquiries are "logically related, the two inquiries must be conducted in the proper order. We may not assume an answer to the first question in order to avoid difficult constitutional issues." McClish, No. 06-11826, slip op. at 13.

## A. Did Brown Violate Skop's Constitutional Rights?

We begin, therefore, with the first step in the qualified immunity inquiry -- whether Brown violated Skop's constitutional rights in arresting her. Under the Fourth Amendment, an individual has a right to be free from "unreasonable searches and seizures." In Fourth Amendment terminology, an arrest is a seizure of the person, California v. Hodari D., 499 U.S. 621, 624 (1991), and the "reasonableness" of an arrest is, in turn, determined by the presence or absence of

probable cause for the arrest. "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quotation marks omitted). This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances. See Maryland v. Pringle, 540 U.S. 366, 370 (2003).

While an officer who arrests an individual without probable cause violates the Fourth Amendment, this does not inevitably remove the shield of qualified immunity. We do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause. As the Supreme Court observed in Anderson v. Creighton, 483 U.S. 635, 641 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable." Thus, even if we determine that the officer did not in fact have probable cause, we apply the standard of "arguable probable cause," that is, whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." Lee

v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) (emphasis added, quotation marks omitted). Indeed, this is "all that is required for qualified immunity to be applicable to an arresting officer." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) (per curiam). This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists.

Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime, Crosby v. Monroe County, 394 F.3d 1328, 1333 (11th Cir. 2004), and the operative fact pattern. Here, the officer suggests that there are two possible crimes for which Skop could be arrested: obstructing a police officer in the lawful discharge of his official duties, and refusing to obey an order from an officer directing traffic. If Officer Brown possessed probable cause or arguable probable cause to arrest Skop for either, he is entitled to qualified immunity. We take each in turn.

### 1. Obstructing a Police Officer

On the offense of obstructing a law enforcement officer, Georgia law provides that "a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a

13

misdemeanor." Ga. Code Ann. § 16-10-24(a). Under Skop's version of the arrest, we easily conclude that a reasonable officer could not conceivably have thought that he had probable cause or even arguable probable cause to arrest Skop -- plainly she did not "obstruct" or "hinder" Brown in the lawful discharge of his official duties, and she certainly did not do so "knowingly and willfully." See id.

Simply put, helping a stranded motorist like Skop was one of Brown's official duties,[1] and the argument that Brown was impeded in this duty because Skop asked Brown to pull his car one foot forward -- a request politely made, without raised voice or threat, and in a situation where she was not distracting his attention from a threatening situation -- is utterly devoid of merit. Indeed, the suggestion that a citizen asking an officer to assist her thereby provides him with probable cause or even arguable probable cause to arrest her is without foundation in our law. Skop's attempts to clarify her question to Brown were not actions that could even conceivably have provided Brown with any basis for an obstruction arrest. See Woodward v. Gray, 527 S.E.2d 595, 598 (Ga. Ct. App. 2000) ("To obstruct, resist, or oppose for purposes of obstructing an officer implies forcible resistance and does not mean the refusal to merely obey the police officer's command to move . . . so that the police could perform their duties unimpeded. For

---

[1] As Major Spillane testified, he would have expected an officer in Brown's position to ask Skop questions such as "Can I help you?" and "Where are you trying to go?"

14

speech to rise to the level of obstruction, it must be reasonably interpreted to be a threat of violence to the officer, which would amount to obstruction or hindrance." (citations omitted)); Coley v. State, 344 S.E.2d 490, 491 (Ga. Ct. App. 1986) (reversing an obstruction conviction because the defendant "did nothing more than fail to respond immediately to [the officer's] orders"); see also Davis v. Williams, 451 F.3d 759, 767 (11th Cir. 2006) ("Neither an owner's simple inquiry as to why officers are present on his property nor a person's attempt to bring a dangerous situation to the officer's attention can be construed as obstruction of justice or disorderly conduct. Nor can a citizen be precluded by the threat of arrest from asking to speak to an officer's superior or from asking for an officer's badge number. Those inquiries likewise do not constitute obstruction of justice or disorderly conduct.").

Taking the evidence in the light most favorable to Skop, there is no indication that she in any way impeded or obstructed Officer Brown in the pursuit of his lawful duties, let alone that she forcibly resisted the police. Again, Skop did not threaten Brown in any way by asking him to move his patrol car. Nor did Skop in any way impede him from securing the safety of the street by barring passersby from approaching the downed tree and power line. Nor, finally, did she obstruct Brown by interrupting his paperwork.

15

Indeed, the idea that Skop's brief inquiry to the officer somehow provided a basis for arrest collides head-on with the First Amendment, which "protects a significant amount of verbal criticism and challenge directed at police officers. . . . The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." See Houston v. Hill, 482 U.S. 451, 461–63 (1987). When, as under Skop's version of the facts, an individual does not even engage in speech that amounts to protected "criticism and challenge," but simply reiterates or attempts to clarify a perfectly reasonable question directed to the officer, there is neither probable cause nor arguable probable cause to arrest for obstruction.

Had the circumstances been different -- for example, had Brown been located at a busy intersection where Skop's inquiry impeded the officer's ability to direct other cars -- this analysis might be different. See Houston, 482 U.S. at 463 (providing, in dicta, possible examples of behavior which may be constitutionally prohibited as obstructive, including "stand[ing] near a police officer and persistently attempt[ing] to engage the officer in conversation while the officer is directing traffic at a busy intersection"). Here, however, Skop's car was the only vehicle to approach Brown's impromptu roadblock. As Officer Brown himself

admitted in his deposition:

> Q: She hindered you because she didn't do what you told her to
>    do?
> A: No.
> Q: She hindered you because she interrupted your paperwork?
> A: No.
> Q: Well, she didn't stop you from telling anyone else not to
>    approach the scene, right?
> A: Not at that point. . . .
> . . .
> Q: And -- And, under the objective circumstances confronting you
>    right there, she didn't stop you from directing any other
>    vehicles away from that scene?
> A: No.

Brown Depo. 218–19.

The district court, nevertheless, viewed Skop's actions as amounting to

obstructing an officer because it concluded that Brown did not know he was

blocking Skop's driveway:

> Thus, taking Skop's facts as true (i.e., that her car was angled to enter
> her driveway, her turn signal was on, and she had repeatedly gestured
> toward her driveway), given Officer Brown's plain purpose in being
> dispatched to Middlesex Avenue (i.e., to ensure residents' safety by
> closing and preventing access to the road due to the fallen tree and
> fallen power and/or utility lines), the court cannot say he was without
> arguable probable cause to arrest Skop for obstruction under O.C.G.A.
> § 16-10-24(a) when, notwithstanding his reasons for refusing to do so,
> she repeatedly requested that Officer Brown move his car and Officer
> Brown did not realize his vehicle was blocking her driveway.

Dist. Ct. Order 16–17 (emphasis added).

We remain unpersuaded. First, we note that Brown's knowledge of his

17

location is of little consequence in evaluating the legality of the arrest. Under Skop's version of the facts -- which we are obliged to accept for our present purposes -- she asked Brown to move his car. Brown did not give her the courtesy of providing any answer, let alone a clear one. Of course, Brown was not obliged to move his car at Skop's request -- but neither was he permitted to arrest her just for asking, altogether reasonably, that he move his car a foot, a premise that holds true regardless of whether Brown knew that he was blocking Skop's driveway.

Second, and perhaps even more basic, to the extent the district court believed that Brown's knowledge of his location was somehow determinative, it misapplied the clear dictates of our summary judgment law by assuming hotly contested facts against the non-moving party. See Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied."). Whether Brown knew that he was blocking Skop's driveway was an important, disputed fact, and one on which Skop clearly provided sufficient evidence to survive summary judgment. Thus, for example, Skop testified that her car was turned towards her driveway with the turn signal on. She unambiguously told Brown, on at least three separate occasions, that she wanted to get into her driveway to get out of the storm. She

gestured towards her driveway as she made her request, hoping to communicate to him that she was only trying to pull into her own driveway. After Brown exited his car, Skop said at least twice that "this is my driveway, can you please move up a foot." Skop Depo. 75–76 (emphasis added). And, when he said that he could arrest her for obstruction, she responded, "How can you arrest me for obstruction, this is my driveway?" Id. at 76.

Skop also presented photographic evidence showing the position of her car, angled towards her driveway and with the turn signal apparently illuminated.[2] As Skop testified, "my car was turned to enter my driveway, my blinker was on, I had repeatedly gestured toward my driveway, and I told him that I was trying to get into my driveway. I believe that Brown reasonably should have been able to ascertain my residence from all these circumstances." Skop Decl. ¶ 50; see also Civil Service Appeal, Testimony of Major Spillane 13 (Doc. 42, Ex. 55) ("What I discovered on the scene was by talking to [Skop's neighbors] and looking at the scene and the position that they said the police car was in and the position that she said her car was in or what they told me her car was in, all their stories kind of corroborated each other[]."). In entering final summary judgment for Brown, the district court failed to draw a critical inference in a light most favorable to Skop --

---

[2] Another photograph reveals Skop standing beside Brown's patrol car with her right arm extended in a gesture that could be interpreted as pointing towards her driveway or house.

19

that Brown well knew Skop was merely trying to get into her own driveway, and he went ahead and arrested her anyway. In short, we are constrained to conclude that Officer Brown did not possess probable cause or even arguable probable cause to arrest Skop for obstruction under the law of Georgia.

2. <u>Refusing to Comply with an Order from an Officer Directing Traffic</u>

Officer Brown proffers a second offense which, he says, provides a basis for arresting Skop: refusing to comply with an order from a law enforcement officer directing traffic. Under Georgia law, "[n]o person shall fail or refuse to comply with any lawful order or direction of any police officer . . . with authority to direct, control, or regulate traffic." Ga. Code Ann. § 40-6-2. While this is arguably a closer question, on this record, again, taking the evidence in a light most favorable to Skop, we conclude that Brown possessed neither probable cause nor arguable probable cause to arrest.

The traffic offense, we are told, was based on Skop's alleged failure to follow Brown's order that she park her car on the side of the street and walk to her home. Under the terms of the Georgia statute, as we see it, Brown probably could have arrested Skop if she had refused to obey a lawful order that she park her car at the side of the road. However, we need not decide whether Skop's behavior gave

20

Brown probable cause or arguable probable cause to arrest for failing to follow his order. The reason that summary judgment was inappropriate here is basic: Skop presented evidence sufficient to raise a genuine issue of material fact concerning whether Officer Brown ever actually ordered her to park her car on the side of the street. If Brown never gave Skop such an order, or if he did so but well knew[3] that Skop could not and did not hear him, Brown would not have had even arguable probable cause to arrest. Obviously, Skop could not be arrested for failing to obey an order she was never given. Thus, determining whether Brown actually ever gave the order, and, if he did, whether he had reason to believe that Skop heard it is, on this highly disputed factual record, exactly the sort of factual, credibility-sensitive task best left to the jury.

Skop denied ever hearing any command from Brown to park her car. Indeed, at the APD disciplinary proceedings against Brown, Skop testified that if Brown had asked, she would have "parked [her] car. And gone in [her] house unless he told [her] not to go in [her] house." Civil Service Board Appeal 39 (Doc. 42, Ex. 57); see also id. at 46 ("Q: Ms. Skop, did Officer Brown tell you on more than one

---

[3] This is not to say that Brown's subjective state of mind is relevant to the issue of probable cause or arguable probable cause; it is not. Instead, whether Brown thought Skop heard the order is relevant because it goes to our hypothetical officer's objective understanding of the circumstances. Thus, if Brown knew that Skop did not or could not hear the order, our arguable probable cause yardstick -- a reasonable officer "possessing the same knowledge" as Brown, Lee, 284 F.3d at 1195 -- would also have known that Skop did not hear the order, cf. Anderson v. Creighton, 483 U.S. 635, 641 (1987).

occasion that you could park your car at the curb on the street? A: Huh-uh."); id. at 48 ("The only thing he said to me when I walked around to the driver's side of his car and he lowered his driver's side window was, [']can't you see the power lines are down, the tree is down, this is a hazardous area.['] And he rolled the window back up." (emphasis added)).

Viewing the facts in a light most favorable to Skop, the order to park her car was never given. In fact, Skop argued that the traffic offense was manufactured by Officer Brown after the fact in order to buttress an unpersuasive obstruction charge. In support, beyond her own very different testimony on this point, Skop alludes to a number of basic inconsistencies in Brown's account itself. Among other things, Brown's statements about his contacts with other vehicles at the scene were squarely in conflict. Thus, at his deposition, Brown testified that he had not been in contact with any other vehicles before Skop arrived. But, on the night of the arrest, Brown told Sergeant Padgett, the APD watch commander, that he had been turning away other cars. This could readily support the inference that Brown, in an attempt to recharacterize the arrest as involving a refusal to obey lawful traffic instructions, misrepresented the facts to make it appear as if he had been actively engaged in directing traffic or giving traffic orders when Skop arrived on the scene.

22

Moreover, Brown's account of his rationale for the arrest -- and how the arrest related to the traffic offense -- is also arguably inconsistent, and given in a manner that supports Skop's claim. Thus, for example, Brown told Padgett that he was concerned about letting Skop "walk down and get electrocuted" -- that part of the reason he arrested her was that she had placed herself in danger from the power lines at the end of the block by exiting her car. In other testimony, however, Brown said that he had instructed Skop to park the car and walk home, believing that it would be safer to have her get out of her car and walk to her house, which he purportedly believed to be further down the street near the downed power lines.[4] Whether Brown told Skop to park and walk down the street, or, rather, arrested her for her own safety because he thought she was going to do exactly that, is not at all clear.

Beyond this, Skop points to the fact that Brown, by his own account, was motivated by self-interest to misrepresent the circumstances of the arrest. During

---

[4] Regarding the danger presented to Brown and Skop from the wires, Brown testified as follows:

A: [My vehicle] was grounded by the four rubber tires.
Q: So you figured there would be no conductivity inside the vehicle?
A: That's right.
Q: So the safest place for Miss Skop to be was inside her vehicle?
A: The safest place for me to be was inside my vehicle.
Q: And the safest place for her to be was to remain inside her vehicle?
A: I didn't believe so.

Brown Depo. 192–93.

his deposition, Brown admitted that his post-arrest actions were shaped by the fear that he or the department could be liable for his arrest of Skop. Discussing his decision to make a custodial arrest, Brown testified at his deposition this way:

> Q: [Y]ou had the discretion right then and there to issue citations and release her to walk inside her house, didn't you?
> A: I had already placed my hands on her.
> Q: . . . Are you trained, sir, that once you place your hands on . . . someone, you can't release them from your custody?
> A: I can release them.
> Q: So you had that discretion?
> A: I can; but in the manner that this took place, I knew that I wouldn't have the -- the discretion to do so. I knew that it was the best to -- It was in the best interest to actually take her into custody.
> Q: Well, now whose interests were served by taking her into custody, Officer Brown?
> A: It would have -- It would have been myself.
> Q: Right. 'Cause if you had arrested her and then released her you were afraid you were going to get sued --
> A: Absolutely
> Q: -- weren't you?
> . . .
> A: If I would have arrested her and then released her, it wouldn't have -- it wouldn't have been beneficial for myself.
> Q: It would not have been beneficial for yourself?
> A: No.
> Q: So you were looking out for your own interest?
> A: No, I wasn't looking out for my own interests.
> Q: Well, whose interests were you looking out for then?
> A: The department's.
> Q: How so?
> A: For liability issues.

Brown Depo. 215–17 (emphasis added).

24

Brown squarely admitted that his decision to make a custodial arrest was shaped by his concern that he or the department could be liable for his arrest of Skop. Skop argues that Brown was likewise motivated to misrepresent the circumstances of the arrest itself, including whether any order to park was ever given. In light of Brown's admission that his post-arrest actions were at least partially motivated by a fear of liability and the inconsistencies in his account -- inconsistencies evinced by the accounts of Skop's neighbors and admitted by Brown's supervisor[5] -- the district court erred in failing to consider Skop's claim that Brown's version of the arrest was flatly untrue. See Kingsland v. City of Miami, 382 F.3d 1220, 1231–33 (11th Cir. 2004) (holding that, given the presence of factual issues as to the honesty and credibility of the arresting officers, it was "error for the district court to omit the plaintiff's allegations of falsification and knowing lack of probable cause from its analysis").

In the qualified immunity context, we must ask whether a reasonable officer, acting under these circumstances and possessing the knowledge the arresting officer actually possessed, could have believed he had probable cause to arrest. Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). In reviewing the grant of

___

[5] Indeed, Sergeant Padgett, Brown's supervisor, even admitted that Brown's statements were inconsistent, and Skop's neighbors contradicted Brown's version of events. Padgett Depo. 126–28. During his deposition, Padgett said that he was "concerned that the stories were not the same" and thought that these discrepancies "warranted an investigation." Id. at 149.

25

qualified immunity at summary judgment, we are required to "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). Quite simply, under Skop's version of the arrest -- the version we are obliged to credit -- Brown did not possess actual or arguable probable cause to arrest her. If Skop's account of the arrest is true, Brown's actions were, as the Atlanta Police Department's disciplinary proceedings found, an abuse of his authority. More important for present purposes, Brown's actions would have violated the Fourth Amendment. Thus, the answer to the first qualified immunity inquiry -- whether Brown violated Skop's constitutional rights -- is, when viewed through the appropriate summary judgment lens, that he did. Accordingly, we proceed to the second inquiry.

## B. Was the Violation Clearly Established?

The second qualified immunity inquiry is, in the context of this case, straightforward: our binding precedent clearly established, at the time of Skop's arrest, that an arrest made without arguable probable cause violates the Fourth Amendment's prohibition on unreasonable searches and seizures. See, e.g., Davis

26

v. Williams, 451 F.3d 759, 764 n.8 (11th Cir. 2006); Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir. 1998). Because Skop has shown, at least when the facts are viewed in the light most favorable to her, that Brown did not possess arguable probable cause to arrest her and thus violated clearly established law in arresting her, she is entitled to have her case heard by a jury.

"Qualified immunity is, as the term implies, qualified. It is not absolute." Kingsland, 382 F.3d at 1233. The qualified immunity defense focuses on whether the law provided Officer Brown with "fair warning" that his conduct violated the Fourth Amendment. See Hope v. Pelzer, 536 U.S. 730, 741 (2002); McClish v. Nugent, No. 06-11826, slip op. at 36 (11th Cir. Apr. 11, 2007):

> Although exact factual identity with a previously decided case is not required, the conduct must have been clearly unlawful in light of pre-existing law. See Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) ("[T]he salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." (quoting Hope, 536 U.S. at 741 (first alteration added)); see also Saucier v. Katz, 533 U.S. 194, 205 (2001) (noting that a motivating concern of this immunity inquiry is to "acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct"). As the Supreme Court recently held, qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

When an officer plainly violates the legal rights of the people he serves, and when a reasonable officer in his position had fair warning that his conduct was

27

unlawful, § 1983 suits exist to provide a vehicle for recourse. In a false arrest case such as this one, qualified immunity protects the police from such suits, but only up to the line defined by the arguable probable cause standard -- whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195. Where, as here, the resolution of disputed critical facts determines on which side of this line the officer's conduct fell, summary judgment is inappropriate. Accordingly, we are constrained to reverse the district court's entry of final summary judgment for Brown and remand for further proceedings consistent with this opinion.

## C. Skop's Malicious Prosecution Claim

In addition to her § 1983 false arrest claim, Skop brought a § 1983 federal malicious prosecution claim[6] against Officer Brown. As the district court properly recognized, the Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983." Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003). The district

---

[6] Although Skop's complaint initially contained a state malicious prosecution claim, along with a state false arrest claim, the state law claims were abandoned in the district court. See Dist. Ct. Order 7 n.14.

28

court then determined that Skop had failed to show that "Officer Brown acted without probable cause, a necessary element of her § 1983 malicious prosecution claim," Dist. Ct. Order at 20, and thus found that Brown was also entitled to qualified immunity on the malicious prosecution claim. While it is surely true that a Fourth Amendment violation is a necessary element of a federal malicious prosecution claim, Wood, 323 F.3d at 882, we have already found that Officer Brown's actions, when viewed in a light most favorable to Skop, constituted a violation of clearly established law. Accordingly, we are also required to reverse and remand the entry of final summary judgment for Brown on Skop's federal malicious prosecution claim.

### III. Skop's Claims Against Padgett and the City of Atlanta

As for Skop's claims against the City of Atlanta and Sergeant Padgett, we affirm the district court's order of final summary judgment for those defendants. As the district court observed, Skop failed to present evidence to defeat Padgett's summary judgment motion -- there was virtually nothing in the record to support her claim that Padgett conspired with Brown in an effort to cover up the actual circumstances of her arrest. With regard to the City of Atlanta, the district court entered summary judgment, concluding that since Brown had arguable probable

29

cause to arrest Skop, there could be no constitutional violation. Although we have reversed the district court's finding of arguable probable cause, we nonetheless affirm the entry of summary judgment for the city, albeit on different grounds.

Municipalities are not wholly immune from liability. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 700 (1978) (overruling Monroe v. Pape, 365 U.S. 167 (1961)). But it is by now axiomatic that in order to be held liable for a § 1983 violation, a municipality must be found to have itself caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory. Id. at 694–95; City of Canton v. Harris, 489 U.S. 378, 385 (1989). Thus, Skop can only succeed on her § 1983 claim against the City of Atlanta by showing that her injury was the result of the city's unlawful "policy or custom." Monell, 365 U.S. at 694. In order to sustain her claim that her injury was the result of improper training, Skop was required to "bring forth some evidence of a pattern of improper training to sustain [her] claim, and [s]he must show that [Atlanta] was aware of the deficiencies in the program." See Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005).

After careful review of the summary judgment record, it is plain that Skop has failed to meet this standard. The City of Atlanta undeniably trains its officers not to arrest unless there is probable cause to support the arrest. Indeed, the fact

that Officer Brown was officially disciplined for his actions by the Atlanta Police Department well in advance of the present lawsuit suggests that his actions were inconsistent with APD goals and training. Because Skop has not introduced any evidence that a custom or policy of the City of Atlanta was a "moving force" of her unconstitutional arrest, see Monell, 436 U.S. at 694, we affirm the district court's award of final summary judgment to the city.[7]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**

---

[7] Following oral argument, Skop moved us to permit the filing of a supplemental brief providing record citations and addressing new authority. That motion is DENIED as moot.