[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12840

_____

D.C. Docket No. 5:13-cv-00038-RS-CJK

CHRISTOPHER J. WINDSOR,

Plaintiff-Appellee,

versus

CHRIS EAVES,
in his individual capacity as a
Bay County Sheriff's Deputy,

ANTONIO JONES,
in his individual capacity as a
Bay County Sheriff's Deputy,

BRYAN SHAVERS,
in his individual capacity as a
Bay County Sheriff's Deputy, and

MIKE MCCRARY,
in his individual capacity as
a Bay County Sheriff's Deputy,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 5, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and SENTELLE,[*] Circuit Judges.

PER CURIAM:

The defendants in this case, four sheriff deputies in Bay County, Florida, arrested Christopher J. Windsor on January 10, 2011. Claiming that the arrest violated his rights under the Fourth Amendment, Windsor sued all four in their individual capacities under 42 U.S.C. § 1983. The deputies moved for summary judgment, contending that they were entitled to qualified immunity. The district court denied that motion. This is the deputies' appeal.

**I.**

We recount the facts surrounding Windsor's arrest in the light most favorable to him. See Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013). If disputes about the facts arise, we must credit Windsor's version of them. Id. We acknowledge that "the 'facts,' as accepted for purposes of summary judgment, may not be the actual facts of the case." Id. Nevertheless, we

_____

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

2

view the facts from Windsor's perspective because the determinative issue on appeal is "'not which facts the parties might be able to prove'" but whether "'certain given facts'" demonstrate a violation of clearly established law. Crenshaw v. Lister, 556 F.3d 1283, 1289 (11th Cir. 2009) (quoting Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)).

The defendants stopped Windsor on January 10, 2011, by positioning their vehicles to pen in his van as he attempted to leave the parking lot of a local pool hall, Rack 'Em Billiards and Brew. The white van Windsor was driving had belonged to his late father, Frank. Two days before the stop, Deputy Eaves had run a tag query on the van. According to Eaves, he ran the query because he had received an anonymous complaint about a "beat up" white van following a woman home from Rack 'Em, although he concedes that Windsor's van was not "beat up."

The tag query results indicated that the tag was valid and that the van was registered to Frank Windsor, who was deceased. To determine who might be driving the van, Deputy Eaves ran an additional query for people with the last name Windsor who lived in the area. This query revealed the plaintiff's name, Christopher Windsor, and that he lived in the same county as Frank Windsor. It also indicated that the plaintiff's brother, Edward Windsor, lived at the same address as Frank Windsor. Deputy Eaves then discovered that Edward had several outstanding warrants: an "escape warrant" and "some burglary warrants" from

3

California, along with "a few warrants" that were local and that the record does not specify. What Eaves did not discover, however, is that Edward Windsor had been dead for nearly a decade at the time of the tag query.

Based on the query results, Deputy Eaves decided to stop the white van. Eaves contends that he was conducting an "investigative identification stop" to determine whether the driver of the van was Edward, the plaintiff's brother with outstanding California felony warrants. But the testimony of Deputies Chavers,[1] McCrary, and Jones could reasonably be interpreted to show that Eaves told them before the stop that the van's driver had a warrant for his arrest. And Eaves himself testified that there was a lot of "screaming" and "excitement" during the stop "because of the nature of the crime[s]" he believed the van's driver to have committed, which suggests that this may have been more than an "investigative identification stop." Finally, Windsor testified that none of the deputies asked him any investigative questions before they physically removed him from his car, forced him to the ground, and handcuffed him.

Video evidence corroborates Windsor's testimony. The video shows that he stopped the van as soon as the four deputies surrounded it. The deputies then immediately jumped out of their own vehicles, rushed up to the van, and opened the driver side door with no hesitation. Ten seconds later, they had Windsor

---

[1] Because of an error in Windsor's complaint, Deputy Chavers is misidentified in the caption of this appeal — and other case documents — as "Bryan Shavers."

4

handcuffed on the ground.  There is no audio on the recording, but the short lapse in time from when Windsor stopped the van to when the deputies had him handcuffed leads to the reasonable inference that they did not ask him any questions before arresting him.  At the very least, the video directly conflicts with Deputy Eaves' testimony that the deputies spent four to five minutes questioning Windsor about his identity before initiating an arrest.  And we are required at this stage to credit Windsor's version of the encounter.  See Feliciano, 707 F.3d at 1247; see also Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Consistent with the video, Deputy Jones testified that he initiated the encounter by opening Windsor's door, grabbing his arm, pulling him out of the van, and placing him face down on the ground.  Deputy Eaves testified that he assisted, grabbing Windsor's wrist and helping pull him out of the van.  Deputy Chavers testified that he applied a "[s]traight arm, to the ground" to Windsor and pushed his lower back to get him down on the ground.  Once Windsor was on the ground with his hands behind his back, he tried to get up as the deputies continued to push him down on the ground.  At one point, Windsor tried to use his head to

5

push himself up, scraping it on the gravel parking lot.  Deputy McCrary put his foot under Windsor's face to act as a buffer between it and the ground.  As a result of some combination of all of these actions, Windsor suffered both minor cuts and bruises and a neck injury that required surgery to correct.

After correctly identifying the arrestee as Christopher Windsor and not his brother Edward, who the deputies believed had pending arrest warrants, the deputies nonetheless continued to hold him for "resisting arrest without violence" and took him to the Bay County jail for processing.  See Fla. Stat. § 843.02.  The Assistant State Attorney later dismissed the charges against Windsor.

Windsor sued the deputies in their individual capacities, asserting an unlawful arrest claim against Deputies Eaves and Jones and an excessive force claim against all four deputies.  See 42 U.S.C. § 1983.  They filed a motion for summary judgment on the ground of qualified immunity.  The district court ruled that all four of them had violated Windsor's clearly established constitutional rights and thus were not entitled to qualified immunity.  It denied their motion for summary judgment.

## II.

We review de novo the district court's denial of summary judgment on qualified immunity grounds and apply the same legal standards that it applied.  Feliciano, 707 F.3d at 1247.  Qualified immunity completely "protects government

6

officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002)).  Because Windsor admits that the deputies were acting within the scope of their discretionary authority when they arrested him, the burden is on him to show that qualified immunity does not apply.  See id. at 995.  He must satisfy that burden for both his unlawful arrest and excessive force claims.  We address each in turn.

### III.

Windsor first contends that Deputies Eaves and Jones violated his Fourth Amendment rights by unlawfully arresting him.  Because they had no warrant, the arrest was unlawful under the Fourth Amendment unless it was made with probable cause.  Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004); Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998).  Even assuming that the deputies lacked probable cause to arrest Windsor, they are nonetheless entitled to qualified immunity from his Fourth Amendment claim as long as they had "arguable probable cause" to arrest him.  Redd, 140 F.3d at 1382. That standard asks whether "reasonable officers in the same circumstances and possessing the same knowledge" as the deputies could have believed, at the time of

7

Windsor's arrest, that he "had committed or was committing a crime." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007) (quotation marks omitted).

The deputies acknowledge that they lacked even arguable probable cause to arrest Windsor when they initially stopped him. He was driving a legally registered van, and he was not violating any traffic laws. There was no reason to believe Windsor had committed or was committing any other crime.

Even so, the deputies argue that they did not violate the Fourth Amendment because they were conducting an investigative stop — a so-called Terry stop — instead of an arrest. See United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (noting that an officer is permitted under the Fourth Amendment to stop and briefly detain an individual for investigative purposes based on a reasonable suspicion of criminal activity). See generally Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). The record refutes that argument, however. Deputies Chavers, McCrary, and Jones testified that they believed that they were helping Deputy Eaves arrest a specific person — not helping him investigate the identity of the van's driver. And Windsor testified that none of the deputies asked him any questions or attempted to identify him before arresting him. Consistent with that testimony, the video shows that they had him handcuffed on the ground within 10 seconds after the van stopped.

8

Accepting those facts in the light most favorable to Windsor, see Feliciano, 707 F.3d at 1247, no reasonable officer in the deputies' circumstances could have believed that what they did was a valid Terry stop. See United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) (listing the four factors that mark a Terry stop). They did not use the "quick and non-intrusive" methods that we have approved as reasonable where there is only reasonable suspicion. See id. (allowing officers to ask permission to search a car under Terry). While the deputies were diligent, their diligence was not, as it should have been, "in pursuing their investigation," id., but instead was in removing Windsor from the vehicle and forcing him to the ground and handcuffing him; only after doing that did they pursue their investigation by asking him any questions. "[T]he scope and intrusiveness of the detention" of Windsor "exceeded the amount reasonably needed . . . to ensure their personal safety." Id. Given that they outnumbered Windsor four to one, it was unreasonable for them to physically remove him from the van, force him to the ground, and restrain him before even asking him his name. See id. at 1146–47 (summarizing our cases about how much "restriction on freedom of movement" a Terry stop may involve). Given the circumstances, the duration of the stop was also unreasonable. See id. at 1147–48. The deputies did not engage in a valid Terry stop of Windsor. It was an arrest.[2]

---

[2] The deputies argue that the district court misapplied the "fellow officer rule" to determine

9

The deputies argue that even if they did arrest Windsor, they are still entitled to qualified immunity because they had arguable probable cause to believe he was violating Florida Statutes § 843.02, which prohibits resisting officers "in the lawful execution of any legal duty."  A reasonable officer could not, however, have believed that Windsor was violating that statute.  See Skop, 485 F.3d at 1137 (defining "arguable probable cause" as the situation where "reasonable officers in the same circumstances and possessing the same knowledge" as the arresting officer "could have believed" that the arrestee "had committed or was committing a crime").  An offense under § 843.02 requires that the resistance or obstruction occur while "the officer was engaged in the lawful execution of a legal duty." Storck v. City of Coral Springs, 354 F.3d 1307, 1315 (11th Cir. 2003) (emphasis added).  Windsor's resistance occurred when the deputies removed him from the vehicle, forced him to the ground, and handcuffed him.  They were not lawfully executing a legal duty then because they were not lawfully detaining Windsor.  So they had no arguable probable cause to believe that he was engaged in "obstruction or resistance of [a] lawful duty" in violation of § 843.02.  Storck, 354 F.3d at 1315 (emphasis added).  Because no reasonable officer in the deputies' circumstances

---

that their initial encounter with Windsor was an arrest instead of a Terry stop.  See Terrell v. Smith, 668 F.3d 1244, 1252 (11th Cir. 2012) ("'The fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers.'") (quoting Voorhees v. State, 699 So. 2d 602, 609 (Fla. 1997)).  We have no occasion to decide whether the district court erred in that regard because we conclude, without considering the fellow officer rule, that their encounter with Windsor was not a valid Terry stop.

10

and possessing their knowledge could have believed otherwise, the district court correctly denied their motion for summary judgment.  Skop, 485 F.3d at 1137.

## IV.

Windsor also claims that all four deputies used excessive force in arresting him.  Given our determination that what the deputies did amounted to an arrest for which they lacked even arguable probable cause, preexisting law clearly establishes that any force used in accomplishing it was excessive.  See Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1332 (11th Cir. 2006) ("[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest."); Hamm v. Powell, 874 F.2d 766, 770 (11th Cir. 1989); see also Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1304 (11th Cir. 2006).  The district court correctly denied summary judgment on the excessive force claim.[3]

## V.

For the reasons discussed, taking the evidence in the light most favorable to Windsor, the deputies are not entitled to qualified immunity.  The district court's order denying them summary judgment is **AFFIRMED**.[4]

---

[3] Because we hold that the deputies are not entitled to qualified immunity on either claim, we do not reach Windsor's alternative argument concerning his excessive force claim, which is that even if there had been arguable probable cause to arrest him the force used was still excessive.

[4] This appeal was originally scheduled for oral argument but was removed from the oral argument calendar by a unanimous vote of the panel under 11th Circuit Rule 34-3(f).

11