[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10088

_____

D.C. Docket No. 0:15-cv-62071-BB

LIVINGSTON MANNERS,

Plaintiff - Appellant,

versus

OFFICER RONALD CANNELLA,
individually,
OFFICER KARRIE SABILLON,
individually,
CITY OF HOLLYWOOD, FLORIDA,

Defendants - Appellees,

OFFICER PAUL SCHEEL,
individually,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 4, 2018)

Before MARCUS, FAY, and HULL, Circuit Judges.

MARCUS, Circuit Judge:

In 2014, Livingston Manners was arrested by City of Hollywood police officers. An altercation ensued. Manners filed suit in federal court regarding the incident and now appeals the district court's grant of summary judgment against his claims -- federal civil rights claims for use of excessive force and for malicious prosecution as well as a companion state common-law claim for false arrest. Because the officers had probable cause to arrest Manners and did not violate clearly established constitutional law during his arrest, the officers were entitled to qualified immunity from the civil rights claims. A finding of probable cause also bars a claim for false arrest. Accordingly, we affirm.

## I.

## A.

Close to three in the morning on June 24, 2014, Livingston Manners was sitting in his car on the side of Plunkett Street, a residential street in the City of Hollywood, Florida ("the City"), before heading to work. Ronald Cannella, a City of Hollywood police officer, was on patrol "in reference to recent crimes of theft in the area," and he drove past Manners. Soon after Cannella drove by, Manners pulled out and turned south on 26th Avenue. There is a dispute about what

2

happened next.  Cannella said he saw -- through his rearview mirror -- that Manners ran a stop sign.  Manners claimed that he came to a complete stop.

Cannella made a U-turn and followed Manners down 26th Avenue.  At some point between Plunkett Street and Pembroke Road, a distance of some four or five blocks, Cannella activated his emergency lights and also ran his sirens, although there is some dispute about when exactly this happened.  Manners admitted that, some three blocks past Plunkett Street, he saw Officer Cannella behind him and that the officer's lights and sirens were on.  Cannella said that he "activated [his] emergency lights and sirens, as [he] hit the intersection of Pembroke Road and 26th Avenue" and that he was directly behind Manners's vehicle at that intersection.

On this record, however, and taking the evidence in a light most favorable to the plaintiff, it is undisputed that Manners did not stop when he saw Cannella behind him, or when he saw Cannella's lights and sirens activated.  Manners knew that the vehicle was a police car, that a police officer was instructing him to stop, and that the lights and sirens meant he was required to stop his car.  Instead of stopping, Manners continued along 26th Avenue, through a traffic light at Pembroke Road, and stopped at a gas station across the intersection.  We know this because Manners has said repeatedly, and explicitly, that he did not stop when

3

directed to do so.  In a sworn deposition, Manners offered the following explanation:

Q: Why did you not stop?

[Manners]: Because it was dark.  It was very dark.

Q: And you had no doubt that it was police officer pulling you over, correct?

A: Yes, ma'am.  That's why I slowed down.

Manners has also clearly described why he chose not to stop immediately -- because he was afraid of being hit or killed by a police officer:

Q: So when an officer puts his lights and sirens on to you that means slow down?

A: No.  That means stop, but in this particular -- in this particular instance -- ma'am, I ran into situations before. . . . I've ran into situations before where I've got punched or hit by a police officer because of my [stature].  I'm big and black.

In testimony at his criminal trial in Broward County, Manners offered the following answers:

Q: Now, did you pull over upon seeing the flashing lights?

[Manners]: No, I d[id] not.

Q: Why didn't you pull over immediately?

A: It was late at night, sir . . . . I was in fear for my life.

4

Manners offers that because he was afraid, he continued driving until he reached a well-lit gas station where video surveillance was available. By Manners's own account, the distance he intentionally travelled after seeing the officer behind him with lights and sirens, but before coming to a stop, was about three blocks, one-tenth of a mile, or 176 yards. He continued to drive after being directed to stop for 14.4 seconds, or, as he said at another occasion in his deposition, for "[a]bout two minutes, two minutes at the most."[1]

At the gas station, Cannella stopped behind Manners and approached the driver's side of Manners's car. Cannella asked for Manners's driver's license, which Manners provided. A silent video recording of the entire incident at the gas station was taken from surveillance cameras. Cannella can be seen at Manners's driver's side door, and while Cannella looked in the backseat, Manners stepped out of the vehicle. Cannella and Manners spoke, facing one another, for several seconds. There is no dispute that Cannella informed Manners he was under arrest. Manners knew this; in fact, Manners said he asked Cannella to hurry up so that he could get to work and Cannella said "[y]ou're going to jail." According to Cannella, he repeatedly directed Manners to get back into his car, but Manners

---

[1] At oral argument, counsel for the officer defendants conceded that, whether using Manners's testimony or Cannella's, the time between Cannella activating his emergency lights and Manners pulling over could not have been two minutes. Counsel for the officers also conceded that under Cannella's version of the facts, Manners travelled fewer than 14 seconds after Cannella was directly behind him with lights activated.

5

refused to do so. Cannella then placed Manners under arrest. Cannella said: "I must have told him at least two to three times [to remain seated in his vehicle] and he said, no, every time." Manners, on the other hand, denied that Cannella ever directed him to stay in the car.

A review of the video recording clearly establishes that a physical struggle ensued when Cannella attempted to place Manners under arrest. Manners's efforts to thwart the arrest are equally evident from the video. The first attempt to handcuff Manners occurred outside the vehicle -- Cannella apparently grabbed Manners's wrist as Manners either sat or fell back into his car. A struggle ensued in the car; Cannella leaned or fell on top of Manners, and he tried to pull Manners out of the vehicle. The parties disagree about what happened inside the car. Manners conceded that he pulled back, asked why he was under arrest, and said Cannella punched him three times while lying on top of him. Cannella, in turn said Manners screamed at him and struck him (Cannella) three to four times.

After the details of an indiscernible struggle occurred inside the car, the video recording shows that Cannella pulled Manners out of the car. Cannella flipped Manners onto the ground and went on top of him. Manners, in turn, is seen shoving at Cannella, and Cannella is seen punching Manners in the head. Cannella then flipped Manners onto his stomach and attempted to bring Manners's arms together behind his back, evidently attempting to handcuff Manners. Manners is

6

seen pulling his arms away, flailing, and then rolling onto his back.  Manners is also seen bringing his leg up and onto Cannella's upper back, and grabbing and holding Cannella's wrists for an extended period.

Officer Sabillon arrived on the scene as backup; she said it "looked like [Cannella] was trying to take Livingston Manners into custody, but he couldn't because of the constant power struggle between the both of them with their hands." On the video recording, Sabillon is seen deploying her taser on Manners's stomach.  Manners flailed on the ground, and both Cannella and Sabillon are seen attempting to handcuff him for about a minute, deploying one or both of their tasers.  Eventually, Sabillon is seen lying across Manners, while Cannella placed Manners in handcuffs.  More officers arrived, and four or five of them surrounded Manners and attempted to fully restrain him.  Manners is eventually seen lying on his back, handcuffed, and subdued.  At no point thereafter was he struck or tased by the officers.

The parties disagree about what Cannella and Manners said to one another during the incident.  Both sides agree, however, that Cannella advised Manners during the incident that he was being placed under arrest.  The video recording makes it abundantly clear that Cannella (and later Sabillon) attempted to place Manners under arrest, and Manners is clearly visible resisting those attempts for some time, a little more than three full minutes.  The parties agree that at the time

7

of the incident, Manners was 6 feet 2 inches tall and weighed 240 pounds while Cannella was 5 feet 10 inches tall and weighed 215 pounds.

After the incident, Manners was initially charged by the State Attorney in Broward County with attempted homicide, resisting arrest with violence, and battery on a law enforcement officer. He was detained in a maximum security prison. Manners ultimately went on trial on charges of battery on a law enforcement officer and resisting a police officer without violence; he was acquitted of both counts by a jury. As a result of the charges, he incurred approximately $30,000 in legal fees.

## B.

Thereafter, Manners brought this lawsuit in the United States District Court for the Southern District of Florida, lodging four claims relevant to the appeal: two 42 U.S.C. § 1983 civil rights violation claims alleging that Officers Cannella and Sabillon used excessive force in arresting him; a § 1983 claim against Cannella for malicious prosecution; and a common-law false arrest claim arising under Florida law against the City.[2] The officer defendants moved for summary judgment, arguing that they were entitled to qualified immunity. The City also moved for

---

[2] Another § 1983 claim for failure to intervene was brought against officer Paul Scheel and was later dismissed by stipulation.

summary judgment, arguing that the arrest was supported by probable cause, which constituted a complete defense to Manners's false arrest claim.

The district court granted the defendants' motions for summary judgment. As for the officers, they were entitled to qualified immunity because they violated no clearly established constitutional right. According to the district court, the officers had probable cause to stop and arrest Manners. Canella testified consistently that Manners failed to heed a stop sign, and, the district court reasoned, even accepting Manners's version, a "mistaken but reasonable observation" that Manners had run the stop sign was enough to give Cannella probable cause for the arrest.

The district court also determined that the officers had not used excessive force. The video recording of the incident revealed that Manners repeatedly resisted Cannella's efforts to handcuff him. The district court concluded that the officers had used reasonable force to arrest Manners. As the district court put it, a reasonable officer could have concluded that Manners, a "larger individual, who . . . actively resisted Cannella's efforts," "posed an immediate threat" so that tackling and punching Manners was necessary. Nor was the use of tasers unconstitutionally excessive under Eleventh Circuit precedent. Since no violation of a clearly established constitutional right had been shown, the district court found that the officers were entitled to qualified immunity from the excessive force claims.

9

Having found probable cause to arrest Manners, the district court also concluded that the defendants were entitled to summary judgment on the malicious prosecution and false arrest counts. Probable cause defeated a § 1983 suit for malicious prosecution as well as the companion state common-law false arrest charge.

The district court denied Manners's motion for reconsideration, and this timely appeal ensued.

## II.

We review a grant of summary judgment de novo, and we construe all of the facts in favor of Manners, the non-moving party. See, e.g., Oliver v. Fiorino, 586 F.3d 898, 901 (11th Cir. 2009). Summary judgment is properly granted if there is no genuine issue of material fact and the moving parties demonstrate that they are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); McCullough v. Antolini, 559 F.3d 1201, 1204 (11th Cir. 2009). The moving parties -- here the officers and the City -- bear the burden of demonstrating that there is no genuine issue of material fact. See Fed. R. Civ. P. 56(a); Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008). Even where the parties agree on the facts, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." Warrior Tombigbee Transportation Co. v. M/V Nan Fung, 695 F.2d 1294, 1296–97 (11th Cir. 1983). However, the Supreme

Court has held, summary judgment may be appropriate on facts that are revealed through a video recording: "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record [as with a video recording of the incident], so that no reasonable jury could believe it, a court should not adopt that version of the facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

The central question is whether the officers were entitled to qualified immunity. Qualified immunity is total immunity from suit, rather than a defense to a particular charge. Such immunity allows government officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." Oliver, 586 F.3d at 904; see also Hope v. Pelzer, 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." (quotation marks omitted)). We have described that "[b]ecause qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks omitted).

In order to be entitled to qualified immunity, the officers first must establish that they were acting within their discretionary authority during the incident. See, e.g., id. There is no dispute that the officers were acting within their discretionary authority when they conducted a traffic stop and later arrested Manners. "Once the

11

defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

Qualified immunity is appropriate if the officers' conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Hill v. Cundiff, 797 F.3d 948, 978 (11th Cir. 2015) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The qualified immunity inquiry articulated by the Supreme Court provides immunity for law enforcement officers "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)); see also Lee, 284 F.3d at 1194. These two components may be analyzed in any order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Supreme Court has repeatedly admonished the courts that the inquiry into whether law was "clearly established" is not "define[d] . . . at a high level of generality." Wesby, 138 S. Ct. at 590 (quotation omitted). Rather, the law, developed in on-point precedent, "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. We have emphasized, accordingly, that the question of whether constitutional

12

standards are clearly established is one considering the "specific context of the case." Lee, 284 F.3d at 1194 (quotation omitted).

## III.

Each of Manners's claims rises or falls on whether there was probable cause for his arrest. In order to establish probable cause, an arrest must be "objectively reasonable based on the totality of the circumstances." Id. at 1195; see also Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). An arrest is objectively reasonable and there is probable cause where "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995).

Probable cause "does not require convincing proof" that the offense was committed. Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1120 (11th Cir. 1992). It does not require proof beyond a reasonable doubt or even by a preponderance of the evidence. See, e.g., Lee, 284 F.3d at 1195 ("Although probable cause requires more than suspicion, it does not require convincing proof and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction." (quotations and citation omitted)). Rather,

13

"[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the probable-cause decision." Florida v. Harris, 568 U.S. 237, 243–44 (2013) (second alteration in original) (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)).  "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules."  Wesby, 138 S. Ct. at 586 (quotations and citation omitted).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  Id.  We cannot examine the facts in isolation but, rather, we "consider the whole picture" because "the whole is often greater than the sum of its parts."  Id. at 588 (quotation omitted).

Probable cause for an arrest may be found if there is probable cause to believe any crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed.  See, e.g., Lee, 284 F.3d at 1195–96 ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." (quoting Bailey, 956 F.2d at 1119 n.4 (alteration adopted)).  And it is now settled law that there is probable cause for a warrantless custodial arrest even for a seemingly insignificant crime.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor

criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Moreover, for purposes of granting qualified immunity to law enforcement officers, it is enough that there is "arguable probable cause" for a warrantless custodial arrest. See, e.g., Lee, 284 F.3d at 1195. Arguable probable cause simply means that "reasonable officers in the same circumstances and possessing the same knowledge as the [defendant-officers] could have believed that probable cause existed to arrest." Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010) (quotation omitted).

Reading together what the defendants argued in the district court and argued before us, four theories are offered in support of probable cause. The defendants first claimed that there was probable cause to arrest Manners for running a stop sign; then they argued that the officers could arrest Manners for obstruction of justice when he allegedly refused to remain in his car, or for resisting arrest with violence; and, finally, they urged that he could be arrested for fleeing or attempting to elude a law enforcement officer. On appeal, only two arguments have been offered -- that Manners was lawfully arrested for running a stop sign, and, alternatively, for fleeing or attempting to elude a law enforcement officer. Because the appellees have dropped the theories of resisting arrest and obstruction of justice, we discuss only the first and fourth rationales. Of the two, only one works,

15

but that is enough; probable cause need only exist for one offense to justify Manners's warrantless arrest, and on this record there was probable cause for a reasonable officer to arrest Manners for fleeing or attempting to elude a law enforcement officer.

## A.

The district court found probable cause to arrest Manners for running a stop sign. Even taking (as we must) Manners's version of the facts to be true -- that he did obey the stop sign -- the district court determined that Cannella's observation could have been mistaken, but a mistaken though reasonable belief could support probable cause. We cannot agree that this resolves the question. Even assuming there would have been probable cause to arrest Manners if he ran the stop sign or if Cannella reasonably but mistakenly believed Manners had done so, on this record, there is an undeniable and material factual dispute that precludes summary judgment. Officer Cannella consistently said that Manners failed to stop at the sign. He testified that "[a]s [he] pulled through the stop sign, a vehicle came flying past [him] and made a left turn[,] disobeying the stop sign." Conversely, Manners consistently said that he stopped as required, indeed, he asserted that he came to a "complete stop." The street was in some state of darkness. On this record, a reasonable factfinder could find that Cannella neither saw nor reasonably thought he saw Manners run a stop sign. In the face of a direct factual dispute, summary

16

judgment is inappropriate.  See Kingsland v. City of Miami, 382 F.3d 1220, 1232–33 (11th Cir. 2004) (due to material factual dispute, "the question whether arguable probable cause for the arrest existed [was] aptly suited for a jury").  The district court was not free to resolve a material factual dispute between Manners and Cannella.

B.

There was, however, both arguable and actual probable cause to arrest Manners for fleeing or attempting to elude a law enforcement officer.  Again, probable cause may be found if there was cause to believe any crime was committed.  See, e.g., Lee, 284 F.3d at 1195–96.  Florida law makes "[f]leeing or attempting to elude a law enforcement officer" a felony.  Under the provision cited by the City:

> It is unlawful for the operator of any vehicle, having knowledge that he or she has been ordered to stop such vehicle by a duly authorized law enforcement officer, willfully to refuse or fail to stop the vehicle in compliance with such order or, having stopped in knowing compliance with such order, willfully to flee in an attempt to elude the officer, and a person who violates this subsection commits a felony of the third degree . . . .

Fla. Stat. § 316.1935(1).  Manners's failure to stop when he reasonably and practically could have, and when he knew Officer Cannella was hailing him to stop, provided a sufficient basis for the arrest.

17

There is no dispute that Officer Cannella put on his flashing lights and used his siren when he was directly behind Manners's vehicle at three in the morning. There is no dispute that Manners knew Cannella was a law enforcement officer and that he had been ordered to stop. And there is no dispute that Manners willfully failed to stop when directed to do so because Manners tells us as much in his deposition. By Manners's own version of the facts, he continued to drive for three blocks, or one-tenth of a mile, or for 14.4 seconds after seeing that Officer Cannella was behind him with the patrol car's lights and sirens on. Manners himself said that he knew the lights and sirens meant he was obliged to stop his vehicle but that he made a conscious decision not to do so. The facts known to Cannella were the same. Cannella said that Manners continued to drive his car until he reached a well-lit gas station. Although Manners offered that his windows were rolled down and he was travelling at a slower rate of speed (some 25 miles per hour), he does not claim he provided any indication to Officer Cannella that he intended to stop.

The facts known to Officer Cannella would cause a prudent person to believe Manners had committed the offense of fleeing or attempting to elude a law enforcement officer. See Williamson, 65 F.3d at 158. A prudent person could reasonably believe that Manners's failure to stop when directed to do so by a law enforcement officer violated the words of the statute. Again, the Florida penal

18

code makes it a felony for a vehicle operator "to refuse or fail to stop the vehicle" when directed to do so.  "Fail" means "to neglect to do something."  Webster's Third New International Dictionary 814 (2002).  "Refuse" means "to show or express a positive unwillingness to do or comply with."  Id. at 1910.  "Stop" means "to arrest the progress or motion of" or "bring to a standstill."  Id. at 2250.  But Manners plainly evinced an unwillingness to comply with the officer's command.

Moreover, the officers had arguable probable cause to arrest Manners on the same basis.  To be entitled to qualified immunity on the three § 1983 claims, the officers needed only arguable probable cause.  See Grider, 618 F.3d at 1257.  A reasonable officer in Cannella's shoes, and cognizant of the facts known to Cannella, could have believed that Manners had committed the offense of fleeing or attempting to elude a law enforcement officer.

It does not alter our evaluation simply because the period of time was short so long as Manners could reasonably and safely have complied with the officer's direction but did not do so.  In fact, Florida's courts have found probable cause for the offense of fleeing or attempting to elude a law enforcement officer in the absence of lengthy flight and without a high-speed getaway.  Thus, for example, Florida's Fourth District Court of Appeal found probable cause to stop a motorist for fleeing or attempting to elude an officer when the driver continued at ten miles per hour for five minutes, making five turns, while followed by a police vehicle

19

with lights and sirens activated. State v. Kirer, 120 So. 3d 60, 61 (Fla. Dist. Ct. App. 2013) (noting that, after the officer turned on his lights and ordered the arrestee to stop, the arrestee "kept driving," albeit only at "10 miles an hour"). And Florida's First District Court of Appeal also found reasonable suspicion to justify a stop for flight when, after an officer activated lights and sirens, a motorist slowed down, as if to stop, but proceeded to drive for another "one to two miles, although he could have pulled over on the shoulder during that time." Henderson v. State, 88 So. 3d 1060, 1062 (Fla. Dist. Ct. App. 2012).

Manners argues that any belief he fled or attempted to elude a police officer would be unreasonable. We cannot agree. Even if the short interval between Cannella's command to stop and Manners's compliance undermined the state's ability to prove the offense beyond a reasonable doubt, to reiterate, probable cause is not established by proof beyond a reasonable doubt, or by clear and convincing evidence, or even by a preponderance of the evidence. That a reasonable officer could believe Manners failed to stop when directed to do so suffices to establish arguable probable cause. Thus, Officer Cannella had arguable probable cause to arrest Manners for fleeing or attempting to elude him.

Manners argues, however, that he did not have to stop when he was told to do so both because Florida's flight statute was unconstitutional and out of necessity. First, he claims that the fleeing-or-eluding provision is

20

unconstitutionally vague and that it violates the Fourth Amendment as well.  We need not, and do not consider today whether Florida's fleeing-or-eluding provision is unconstitutional.  Instead, the Supreme Court has instructed us that probable cause for arrest may be found where an officer relies in good faith on a law, even if the law is subsequently found to be unconstitutional.  See Michigan v. DeFillippo, 443 U.S. 31, 37–38 (1979).  No court, whether in the state or federal system, has ever held that Florida's fleeing-or-eluding statute is unconstitutional because it is vague or for any other reason.  That is not surprising because the words used in the statute are clear, unambiguous, and easily understood by the average person.  Moreover, the argument that the statute is unconstitutional is an affirmative defense, not one the officer was required to consider at the outset of this encounter.  See, e.g., Fridley v. Horrighs, 291 F.3d 867, 873 (6th Cir. 2002) (probable cause does not require officer to inquire into availability of an affirmative defense); cf. Sada v. City of Altamonte Springs, 434 F. App'x 845, 850 (11th Cir. 2011) ("It does not appear, . . . that officers are required to consider affirmative defenses in their probable cause calculations.").

Nor was probable cause lacking because of the affirmative defense of necessity.  Manners says he "feared for his life" because he was a black male alone with a law enforcement officer on an empty, dark residential street in the middle of

21

the night, and he "had no reasonable means of avoiding the danger except by driving to [a] safe, well-lit area."  The doctrine of necessity requires that

> 1) the defendant reasonably believed that a danger or emergency existed that he did not intentionally cause; 2) the danger or emergency threatened significant harm to himself or a third person; 3) the threatened harm must have been real, imminent, and impending; 4) the defendant had no reasonable means to avoid the danger or emergency except by committing the crime; 5) the crime must have been committed out of duress to avoid the danger or emergency; and 6) the harm the defendant avoided outweighs the harm caused by committing the crime.

Driggers v. State, 917 So. 2d 329, 331 (Fla. Dist. Ct. App. 2005).  A general distrust of all police officers is not enough to establish the real, imminent, and impending nature of the danger requirement.  Nor is there any showing on this record that either Officer Cannella or the Hollywood police department posed a direct, real, imminent, and impending danger.  Nor, finally, was there any reason for Officer Cannella to know why Manners did not comply with his demand to stop until Manners reached a well-lit gas station.  And even if some exigency existed, Cannella had no reason to know of any perceived necessity.  Again, probable cause is based on the facts known to the law enforcement officer.

Even if Manners's explanation might satisfy a jury if he were charged, failing to stop because of a generalized fear of police does not provide a legal basis to vitiate probable cause for the offense of flight.  Manners by his own account knowingly stopped when he chose to do so, rather than when he was directed to do

22

so, for reasons that may be understandable, but that in no way deprived the police of probable cause.  Moreover, there are strong reasons why stopping at the command of a law enforcement officer is important even if the officer's decision to pull over the motorist is a wrongful one.  Thus, for example, the Supreme Court has emphasized the serious risk of injury, armed conflict, and the "[r]isk of violence [that] is inherent to vehicle flight" from the police.  Sykes v. United States, 564 U.S. 1, 10 (2011) (overruled on other grounds by Johnson v. United States, 135 S. Ct. 2551 (2015)).  In short, the undisputed facts yield the conclusion that the officers had probable cause to arrest Manners for flight.

## IV.

Having determined that there was both actual and arguable probable cause to arrest Manners, we turn to each of his claims.  The § 1983 claims against Officers Cannella and Sabillon for excessive force fail because, with probable cause to arrest Manners, they were entitled to use that quantum of force reasonably necessary and proportionated to effect his arrest.  And Manners's § 1983 claim against Officer Cannella for malicious prosecution fails because there was no Fourth Amendment violation.  Thus, both officers were entitled to qualified immunity.  As for the state common-law false arrest claim against the City of Hollywood, it fails as well, again, because there was probable cause to arrest Manners.

A.

The officers were entitled to qualified immunity on the excessive force claims unless their conduct violated clearly established constitutional law. See, e.g., Wesby, 138 S. Ct. at 589. Manners asserts that a clearly established constitutional violation occurred when the officer defendants used force to arrest him without probable cause. Because we have determined that there was probable cause for the arrest, the officers had the right to use some quantum of force to arrest Manners.

Manners claims that a clearly established constitutional violation occurred even if the arrest was lawful because the officers used unnecessary and gratuitous force when they punched and tased him. But law enforcement officers conducting a lawful arrest have the right to take reasonable physical steps to place a suspect under arrest. In fact, "[w]hen an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled . . . to effectuate a full custodial arrest." Lee, 284 F.3d at 1196. The Fourth Amendment protects persons from the use of excessive force during an arrest. See, e.g., id. at 1197; Graham v. Connor, 490 U.S. 386, 394 (1989).

The Supreme Court has held that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. The determination of whether the force used

24

is reasonable "requires careful attention to the facts and circumstances of each particular case." Id. And the events "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The Graham excessive-force inquiry considers whether officers acted in an objectively reasonable way given the circumstances present during an incident, and the inquiry considers factors such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest." Id.; see also Lee, 284 F.3d at 1197 ("In order to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." (quotation omitted)).

Gratuitous force used during the course of an arrest is excessive. See, e.g., Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (punching arrestee while he was handcuffed and not struggling or resisting constituted excessive force); Lee, 284 F.3d at 1198 (slamming arrestee's head against a trunk "after she was arrested and secured in handcuffs" was excessive); Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment . . . if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.").

25

However, the use of that quantum of force necessary to effect an arrest is not excessive. See, e.g., Graham, 490 U.S. at 396; Gomez v. Lozano, 839 F. Supp. 2d 1309, 1317–18 (S.D. Fla. 2012).

The amount of force used by the officers in this case did not violate the Fourth Amendment. The first Graham factor -- the severity of the crime in question -- cuts in Manners's favor. Manners was only accused of the traffic violation of running a stop sign. The second Graham factor, though, weighs in favor of the officers. A reasonable officer on the scene could believe that Manners posed a threat to Cannella when he moved back into his car and clearly tried to escape Cannella's grasp. Even if, as Manners says, he was merely questioning the arrest and did not use or intend to use any violence against Cannella, we cannot view the facts with the calmness of hindsight. Cannella was alone and was faced with an individual larger than he who plainly was not willing to be arrested. Cannella did not know, at that point, what Manners might have in his vehicle or on his person, or whether Manners intended to hurt him in some way. Indeed, when Officer Sabillon arrived and saw Manners struggling with Cannella, she too could reasonably have concluded that Manners posed a threat to Cannella.

Of the Graham factors, the most relevant one here is resisting arrest. From the video recording, it is abundantly clear that Manners refused to be handcuffed beginning with Cannella's first efforts and continuing throughout a struggle with

26

many officers who attempted to subdue him for at least three full minutes. Cannella had to "make split-second judgments -- in circumstances that [were] tense, uncertain, and rapidly evolving -- about the amount of force that [was] necessary." Graham, 490 U.S. at 397; see also Merricks v. Adkisson, 785 F.3d 553, 563 (11th Cir. 2015) ("If . . . the force was applied when the officer was trying to take control of the suspect or the situation confronting him, the officer can make a much better claim to the qualified immunity defense [than if force was used when a suspect was compliant].").

Substantial force was needed to secure Manners. Manners struggled against Cannella's repeated attempts to place him in handcuffs through physical actions -- rolling over, bracing his arms, shoving at Cannella, and, indeed, grasping and holding Cannella's wrists for an extended period of time. When Sabillon arrived on the scene, Manners continued to struggle against both officers. Rather than being gratuitous, the force used was proportional to restrain someone who was six-foot-two and 240 pounds and was actively resisting for an extended period.

Furthermore, it was not clearly established, at the time of the incident, that the amount of force employed violated the Constitution. Although the Fourth Amendment guarantees a general right to be free from the use of excessive force during a custodial arrest, see, e.g., Oliver, 586 F.3d at 905, Manners must cite to specific cases or otherwise demonstrate that there was a clear violation of the

27

Constitution.  The videotape establishes, as we've repeated, that Manners thwarted Cannella's efforts to handcuff him for quite some time.  The force necessary to handcuff Manners was not excessive under any clearly established precedent.

Nor was the use of tasers by Cannella and Sabillon unconstitutionally excessive.  The use of a taser "beyond [the arrestee's] complete physical capitulation" repeatedly in a short period where an arrestee was mostly cooperative and made no attempt to flee would be excessive.  Id. at 907 (finding the use of the taser shocks was "grossly disproportionate to any threat posed").  Here, however, the taser was used to restrain, subdue, and handcuff Manners, whose resistance was evident from the outset.  It is also clear from the video that the use of the taser, and indeed any force employed by the police, ended once Manners was subdued.  He was never tased "beyond his complete physical capitulation."

In short, we agree with the district court's determination that the force used by the officers was not constitutionally excessive, and that no controlling case law suggested otherwise.

### B.

As for Manners's § 1983 malicious prosecution claim against Officer Cannella, a finding of probable cause for Manners's arrest made summary judgment appropriate.  This Court has determined that malicious prosecution can support a valid § 1983 claim.  See, e.g., Wood v. Kesler, 323 F.3d 872, 881 (11th

28

Cir. 2003).  In addition to establishing the elements of the common-law tort of malicious prosecution -- "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused" -- a plaintiff asserting malicious prosecution under § 1983 must establish that there was an unreasonable seizure made in violation of the Fourth Amendment, such as an arrest made without probable cause.  Id. at 882; see also, e.g., Grider, 618 F.3d at 1256.  Inasmuch as there was probable cause to arrest Manners for flight, the malicious prosecution claim must fail as well.[3]

## C.

Finally, Manners's supplemental, state common-law false arrest claim against the City of Hollywood fails for the same reason.  In Florida, a claim for false arrest requires the plaintiff to establish three elements: "(1) an unlawful detention and [deprivation] of liberty against the plaintiff's will; (2) an unreasonable detention which is not warranted by the circumstances; and (3) an intentional detention."  Lozman v. City of Riviera Beach, 39 F. Supp. 3d 1392, 1409 (S.D. Fla. 2014) (citing Tracton v. City of Miami Beach, 616 So. 2d 457 (Fla. Dist. Ct. App. 1992)).  The first element -- an unlawful detention -- cannot be

---

[3] Manners has not argued that there was any other violation of his Fourth Amendment rights.

29

found where there is probable cause for the arrest.  Under Florida law, probable cause is "a complete bar to an action for false arrest."  Bolanos v. Metro. Dade Cty., 677 So. 2d 1005, 1005 (Fla. Dist. Ct. App. 1996); see also Miami-Dade Cty. v. Asad, 78 So. 3d 660, 669 (Fla. Dist. Ct. App. 2012).  Florida's courts have characterized probable cause as an affirmative defense to a claim for false arrest. See Willingham v. City of Orlando, 929 So. 2d 43, 48 (Fla. Dist. Ct. App. 2006). Since there was probable cause to arrest Manners, the common-law false arrest claim must fail too.

V.

In short, taking the facts in the light most favorable to Manners, this sad incident cannot entitle him to relief on the claims he has raised.  Accordingly, we affirm the district court's grant of final summary judgment to the defendants.

**AFFIRMED.**