[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10841

_____

WILLIAM MARTIN,
MICHAEL MARTIN,

Plaintiffs-Appellees,

*versus*

MIAMI DADE COUNTY,
a Florida County and Political Subdivision
of the State of Florida,

Defendant,

MAURICIO DURAN,
Miami-Dade County Police Officer
in his individual and official capacity,
BRIDGET DOYLE,

Miami-Dade County Police Officer
in her individual and official capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-22107-PAS

_____

Before JORDAN, LAGOA, and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiffs-Appellees Michael and William Martin (the "Martins") filed an amended complaint alleging claims of false arrest, excessive force, and malicious prosecution against Defendants-Appellants Officers Mauricio Duran and Bridget Doyle (the "Officers") under 42 U.S.C. § 1983. The Officers moved to dismiss based on qualified immunity, which the district court denied. This is the Officers' appeal.

After review and with the benefit of oral argument, we (1) affirm the denial of qualified immunity as to the Martins' false arrest and excessive force claims; (2) reverse the denial of qualified immunity as to the Martins' malicious prosecution claims; and (3) remand for further proceedings.

## I.    AMENDED COMPLAINT

At this motion-to-dismiss stage, we accept the facts alleged in the amended complaint as true and construe them in the light most favorable to the Martins. *See Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 856 (11th Cir. 2023). The amended complaint also refers to Officer Doyle's body camera video of the incident. As to the video, we construe ambiguities in favor of the Martins but accept the video's depiction to the extent it "is clear and obviously contradicts the [Martins'] alleged facts."[1] *See Baker v. City of Madison*, 67 F.4th 1268, 1277-78 (11th Cir. 2023); *see also Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (stating a court should view the facts in the light depicted by the video where it "utterly discredit[s]" a party's version of events). Applying those standards, we recount the facts in the light most favorable to the Martins.

### A.    Facts

Plaintiffs Michael and William Martin are brothers. Just before 3:00 a.m. on January 10, 2018, the Martins were walking from a gym through a parking lot headed to their car in a separate parking lot. The incident took place in the first parking lot, which we refer to as "the parking lot."

The Martins were dressed in gym attire—hoodies and basketball shorts—and carried backpacks, and Michael carried a water bottle. In the parking lot, Officer Duran approached the

---

[1] The parties agree this video was incorporated by reference into the amended complaint.

23-10841                Opinion of the Court                4

Martins as they were walking through the lot to their car. Shortly thereafter, Officer Doyle arrived and activated her body camera video (the "video"), which had audio too.

The video begins with Officer Doyle walking through an alley and arriving in the parking lot where Officer Duran and the Martins are. The video shows (1) no cars in the parking lot, save Officer Duran's police car with its emergency lights activated, (2) the Martins are attempting to walk across the lot toward their car and are engaged in no other activity, and (3) Officer Duran is walking closely behind the Martins.[2] The arrests occur in the next 38 seconds of the video.

The first 27 seconds of that 38 seconds of the video show Officer Duran grabbing William's arm twice and then taking Michael down to the ground. Specifically, as the Martins walk, Officer Duran grabs William's arm, preventing him from walking and crossing the lot. Michael then tells Officer Duran to "get your hands off of him," "this is assault," and "do not touch him." William pulls away from Officer Duran's grasp, and the Martins continue walking toward their car.

Officer Duran then states that the Martins are "in the wrong place." Michael states, "What have I done besides walk to my car?" Officer Duran asks, "Do you have a car here? Where's your car at?"

---

[2] At the time Officer Doyle arrives, there is some audio noise but she is not close enough at first to the location of Officer Duran and the Martins for the audio to clearly capture what was said at her arrival.

Michael responds, "That's my business," and William responds, "I'm walking to it." Officer Doyle replies to Michael, "It's not [your business]; it's ours."

Officer Duran then grabs William's arm a second time and says, "I'm telling you to stop." At this point, the body camera video becomes obscured by Officer Duran, but Michael can be heard saying, "Yo, if you touch him again, that's assault." After this statement, Officer Duran performs a take-down maneuver on Michael, sweeping out his legs and slamming him into the ground. Before the takedown, Officer Duran had not said or even hinted that Michael was under arrest.

The next 15 seconds of the video show the tasing of William. As Officer Duran pins Michael to the ground, William approaches and says, "Get off my brother," "you're assaulting him," and "he didn't do anything wrong and you know it." From the ground, Officer Duran instructs Officer Doyle to tase William, which she does.

As Officer Duran continues to pin Michael to the ground, both brothers state that their car is nearby and they have the keys. Officer Doyle says to Michael, "We asked you to stop walking and did you fucking stop? No." Michael responds, "We don't have to stop."

Eventually, additional police officers respond and the brothers are charged with loitering or prowling, battery on a law enforcement officer, and resisting an officer with violence. At their criminal trial, the jury acquitted the Martins.

23-10841　　　　　　　　Opinion of the Court　　　　　　　　6

## B.　　Police Report

After the Martins' arrests, the Officers prepared a police report about the incident. The Martins' amended complaint quotes several statements the Officers wrote in the police report. That police report, as quoted in the amended complaint, states Officer Duran (1) watched the Martins to "see their intent" "due to the time of night," (2) approached the Martins because he "observed both black males walking slowly looking into the parked county vehicle and officers' personal cars inside the station parking lot," and (3) "due to their unorthodox behavior and the time of night, [] requested additional units to assist in stopping both males to question their intentions in the area."

The Officers argue we must accept the statements in the police report as true and that they established reasonable suspicion for Officer Duran to stop the Martins by grabbing William's arm twice and then taking down Michael. We disagree. The amended complaint did quote the police report's statements but also alleged that the police report was "materially false" and was contradicted by Officer Doyle's body camera video. Moreover, before Officer Duran's grabbing of William's arm twice, the video shows no conduct by the Martins other than their walking through the parking lot and both saying they were walking to their car. The amended complaint also alleged, and the video confirms, that Officer Duran approached the Martins in an empty parking lot devoid of cars. The video shows only Officer Duran's police car. And the amended complaint also contained statements that contradict those in the police report, including that the Martins

23-10841               Opinion of the Court                    7

were walking casually through the parking lot without cars and "were not engaged in any apparent criminal activity, as they were walking to their vehicle."

Given the amended complaint alleges the police report is materially false and the video and amended complaint taken together contradict the police report, we cannot consider the police report as true for the purposes of this appeal of the motion to dismiss. *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (stating, where a civil rights plaintiff alleges the contents of a police report are false, "the contents of the report cannot be considered as true for the purposes of ruling on a motion to dismiss").

Therefore, under the amended complaint's allegations and the video in the light most favorable to the Martins, Officer Duran encountered the Martins, two Black males, at 3:00 a.m. while they were walking from a gym across the parking lot to their car and engaging in no other conduct. Officer Duran followed them and forcibly grabbed William's arm twice while William was walking. Michael verbally objected twice when Officer Duran grabbed William's arm. Officer Duran then slammed Michael into the ground. William then verbally objected and was tased by Officer Doyle. With this version of events, we turn to qualified immunity.[3] *See Ounjian*, 89 F.4th at 856; *Baker*, 67 F.4th at 1277-78.

---

[3] The Officers' brief relies heavily on the police report's statement that Officer Duran observed "both black males walking slowly looking into the parked County vehicle and officer[s'] personal cars inside the station parking lot." As outlined above, the Martins' amended complaint contradicts that statement,

23-10841                Opinion of the Court                8

## II.    QUALIFIED IMMUNITY

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quotation marks omitted).  If an official was acting within his discretionary authority, the plaintiff must establish that the official is not entitled to qualified immunity by showing the official's conduct (1) violated a constitutional right (2) that was clearly established at the time of the official's conduct.  *Roberts v. Spielman*, 643 F.3d 899, 904 (11th Cir. 2011).  For a constitutional right to be clearly established, "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quotation marks omitted).

It is undisputed that the Officers were acting within their discretionary authority.  So we evaluate whether the Martins have shown the Officers' conduct violated clearly established constitutional rights.[4]

---

and the video, which starts at Officer Doyle's arrival, does not show any cars other than Officer Duran's in the parking lot where the Martins and Officer Duran are standing.  So that disputed fact is a key issue in the case and for the jury to determine.

[4] We review *de novo* the district court's denial of qualified immunity at the motion-to-dismiss stage.  *Est. of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018).

### III.    FALSE ARREST

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures.'" *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007).  To conduct a brief investigatory stop consistent with the Fourth Amendment, an officer must have "a reasonable, articulable suspicion that criminal activity is afoot." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quotation marks omitted).  The question "is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id.* at 1166.

In addition, "an arrest is a seizure of the person." *Skop*, 485 F.3d at 1137.  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Id.* (quotation marks omitted).  In the qualified immunity context, an officer need not have actual probable cause; arguable probable cause will suffice. *Id.*

At the time of the Officers' conduct in 2018, it was clearly established that a stop made without arguable reasonable suspicion and an arrest made without arguable probable cause violate the Fourth Amendment.  *See id.* at 1143; *Sauls*, 206 F.3d at 1166.  Under the Martins' version of events, the Officers lacked both arguable reasonable suspicion to stop and arguable probable cause to arrest the Martins.  In 2018, any reasonable police officer would know

that he or she could not stop and arrest the Martins for merely walking through a parking lot at night.

That Michael verbally objected to Officer Duran's grabbing William's arm twice, and that the two Martin brothers walked away from Officer Duran, also do not show arguable reasonable suspicion to stop or arguable probable cause to arrest. The freedom of individuals to verbally object to police action without thereby risking arrest was well established and well known in 2018. *See Skop*, 485 F.3d at 1139. "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (quotation marks and citation omitted). While police officers enjoy the liberty to address questions to other persons in public spaces, the person addressed ordinarily "has an equal right to ignore his interrogator and walk away." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (quotation marks omitted).

The Officers also argue they obtained probable cause for the arrest due to the Martins' resistance conduct *after* Officer Duran swept out Michael's legs and threw him to the ground. But the Martins' *post-arrest* conduct cannot supply the probable cause necessary to *initiate* the arrest. *See Davis v. City of Apopka*, 78 F.4th

1326, 1333 n.3 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after.").[5]

The Officers further argue they had "at least arguable probable cause to arrest Michael for assault" because a "reasonable officer could have interpreted Michael saying 'Yo, if you touch him again—' as a threat." What Michael actually said—plain as day on Officer Doyle's body camera video—was "Yo, if you touch him again, *that's assault*." Despite our typical deference to police officers' discretion in fast-paced situations, *see Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018), we must, of course, credit the

---

[5] The Officers suggest Officer Duran had reasonable suspicion to stop the Martins merely because they were walking at night, in dark-colored clothing, through the parking lot of a closed establishment. The Officers' cited Eleventh Circuit cases, however, involved additional factors not present here. *See, e.g.*, *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005) (noting Hernandez was found speeding in her car at night in severe weather, gave an implausible excuse for speeding, told conflicting accounts of her trip's length and purpose, did not know the trip's destination, was traveling between two main source cities for narcotics, and exhibited abnormal nervousness); *United States v. Hardy*, 806 F. App'x 718, 721-22 (11th Cir. 2020) (noting Hardy wore all black clothing at night, was found in a high-crime area near where a 911 call about a "prowler" had just been made, and gave the officer an "unlikely" story for his presence in the area); *United States v. Ligon*, 2022 WL 2091598, at *2-3 (11th Cir. 2022) (noting Ligon was found in black clothing, walking in a roadway at night in a high-crime area near where a murder had recently occurred, and matched a description of the murder suspect); *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991) (noting Briggman was in a parked car at 4:00 a.m. in a high-crime area where the nearby commercial establishments were closed, wore "suspicious clothing," and attempted to evade police prior to the stop).

Martins' version of the statement, which is supported by the footage, not the Officers'. No reasonable officer could construe "if you touch him again, that's assault," as a threat to do bodily harm to the Officers. Thus, this statement cannot provide arguable probable cause to arrest Michael for assault. *See* Fla. Stat. § 784.011(1) ("An 'assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.").

As to William, the Officers argue they had arguable probable cause to arrest him for battery because (1) after the takedown, William moved toward Officer Duran and said, "Get off my brother," and (2) when Officer Doyle reached out to grab William, William turned around and pushed her. But this push is not alleged in the complaint, and it is not visible on the body camera video. Given the amended complaint and the body camera video together, the Officers did not have arguable probable cause to arrest William for battery. *See* Fla Stat § 784.03(1)(a) (stating battery occurs when one "[a]ctually and intentionally touches or strikes another person against the will of the other").

Accordingly, we affirm the denial of qualified immunity on the Martins' false arrest claims.

## IV.    EXCESSIVE FORCE

The Martins alleged two alternative theories for their excessive force claims: (1) the Officers' use of force was excessive

because they lacked arguable probable suspicion/cause to detain or arrest them, so any force at all was excessive; and (2) "[a]lternatively," even if the Officers' detention and arrest of the Martins was lawful, the force used in effectuating the arrest remains excessive.[6]

## A.    Artificial Claim

The Martins' first theory is an "artificial" excessive force claim—a claim that *any* force used was excessive because the stop and arrest were unlawful. *See Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022). It is true that "if a stop or arrest is illegal, then there is no basis for any threat or *any* use of force[.]" *Sauls*, 206 F.3d at 1171 (emphasis added). However, an "artificial" excessive force claim is not a discrete claim and is subsumed within a false arrest claim. *Id.*

While the Martins' "artificial" excessive force claims fail to state independent excessive force claims, they remain relevant to any subsequent determination of damages on their false arrest claims, as they may recover "damages suffered because of the use of force in effecting the arrest." *See Williamson v. Mills*, 65 F.3d 155,

---

[6] It is well-settled that plaintiffs may assert alternative and contradictory theories of liability. *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014); *see* Fed. R. Civ. P. 8(d)(2). At oral argument, the Officers suggested that the Martins failed to plead alternative theories for their excessive force claims. We disagree because the Martins' pleading was sufficient to satisfy Rule 8(d)(2).

158 (11th Cir. 1995); *see also Motes v. Myers*, 810 F.2d 1055, 1060 (11th Cir. 1987) ("It is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation.").

## B.     Genuine Claim

The Martins' second theory is a "genuine" excessive force claim because it "relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." *See Richmond*, 47 F.4th at 1180 (quotation marks omitted). When a false arrest claim and a "genuine" excessive force claim stem from the same incident, the two claims "must be analyzed independently." *Id.* at 1181 (quotation marks omitted).

Taking the amended complaint's allegations and the video in the light most favorable to the Martins, we cannot say that the Martins fail to state plausible "genuine" excessive force claims. The Officers' uses of force—slamming Michael into the ground and tasing William—were not "reasonably proportionate to the need for that force" given the totality of the circumstances facing the Officers prior to that force. *See Ingram v. Kubik*, 30 F.4th 1241, 1251 (11th Cir. 2022) (quotation marks omitted). While the audio does capture some verbal objection to Officer Duran's conduct, there is no clear or obvious physical aggression or resistance shown by either Martin brother prior to the Officers' use of force. At most, the video becomes obscured and unclear at that point, and we must construe any ambiguities in the Martins' favor.

23-10841                Opinion of the Court                15

Further, it was clearly established at the time of the Officers' conduct that a gratuitous use of force is excessive when a suspect is not resisting arrest. *See Saunders*, 766 F.3d at 1267 (characterizing as gratuitous force an officer slamming a non-resisting suspect's head into the ground); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1292 (11th Cir. 2011) (stating it is clearly established that using a taser "is excessive where the suspect is non-violent and has not resisted arrest").

Thus, we affirm the denial of qualified immunity on the Martins' "genuine" excessive force claims.

## V.    MALICIOUS PROSECUTION

We first distinguish between false arrest and malicious prosecution claims and the distinct seizures required for each claim. Under the Fourth Amendment, a claim of false arrest concerns a seizure *without legal process*, such as the warrantless arrests here. *See Wallace v. Kato*, 549 U.S. 384, 389-90 (2007) (stating false arrest claims cover seizures without legal process); *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) ("A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests."); *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330 (11th Cir. 2024) (stating "[a] 'false arrest' claim challenges as constitutionally deficient an officer's on-the-spot determination of probable cause" without legal process).

In contrast, a claim of malicious prosecution requires a seizure *pursuant to legal process*. *See McDonough v. Smith*, 588 U.S. ----,

139 S. Ct. 2149, 2157 (2019) ("Looking first to the common law, . . . malicious prosecution permits damages for confinement imposed pursuant to legal process." (quotation marks omitted)); *Nieves v. Bartlett*, 587 U.S. ----, 139 S. Ct. 1715, 1726 (2019) ("At common law, false imprisonment arose from a detention without legal process, whereas malicious prosecution was marked by *wrongful institution* of legal process." (quotation marks omitted)); *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020) (stating malicious prosecution "is shorthand for a claim of deprivation of liberty pursuant to legal process" (quotation marks omitted)); *Williams*, 965 F.3d at 1158 ("Malicious prosecution . . . requires a seizure pursuant to legal process." (quotation marks omitted)); *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004) (stating a malicious prosecution claim must be based on an unlawful seizure "in relation to the prosecution"), *abrogated on other grounds by Williams*, 965 F.3d at 1159. Seizures pursuant to legal process may include a warrant-based arrest and arrests following arraignment, indictment, or a probable cause hearing. *Williams*, 965 F.3d at 1158; *see, e.g.*, *Sylvester*, 94 F.4th at 1330 ("A 'malicious prosecution' claim is that an officer used a constitutionally deficient legal process to effectuate an arrest—here, an allegedly defective warrant.").

Here, the Martins presented no allegation of an unlawful seizure pursuant to legal process, nor are there facts from which we can draw a reasonable inference of such a seizure. While the Martins argue their warrantless arrests may support their malicious prosecution claims, the precedent above shows otherwise. Simply put, the Martins' warrantless arrests were not seizures pursuant to

legal process and cannot support their malicious prosecution claims. *See Williams*, 965 F.3d at 1158. And the Martins failed to allege any subsequent unlawful seizure pursuant to legal process.

We recognize that the Martins argue, and the district court concluded, that this Court's *Kingsland* decision was abrogated by the Supreme Court in *Nieves* and this Court in *Williams*. *Nieves* and *Williams*, however, did not abrogate *Kingsland*'s holding about the legal process requirement; if anything, they confirmed it, as outlined above. Indeed, *Williams* expressly recognized that a warrantless arrest constitutes a seizure *without* legal process and will not support a malicious prosecution claim. *Williams*, 965 F.3d at 1158.

*Williams* also carefully explained how *Nieves* undermined *Kingsland only* to the extent *Kingsland* turned to modern Florida tort law to determine the common law elements of malicious prosecution. *See Kingsland*, 382 F.3d at 1234 (stating that, in addition to an unlawful seizure pursuant to legal process, a plaintiff alleging malicious prosecution must establish the common law elements of malicious prosecution, and turning to modern Florida tort law for those common law elements); *Williams*, 965 F.3d at 1159 (addressing *Kingsland* and stating that *Nieves* "clarified that the relevant common-law principles are those that were 'well settled at the time of [section 1983's] enactment,'" not those developed by modern state tort law (quoting *Nieves*, 139 S. Ct. at 1726)).

For completeness, we note that the district court also relied on three other decisions to conclude that the Martins' warrantless

arrests could support their malicious prosecution claims: *Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010); *Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003); and *Manners v. Cannella*, 891 F.3d 959 (11th Cir. 2018). But tellingly, *Grider* and *Wood* both concerned malicious prosecution claims stemming from *warrant-based arrests—i.e.*, seizures pursuant to legal process. *See Grider*, 618 F.3d at 1249; *Wood*, 323 F.3d at 876; *Williams*, 965 F.3d at 1164 (noting *Wood* "considered only [a] seizure[] pursuant to a warrant"). They cannot be read as holding that warrantless arrests, *i.e.* seizures without legal process, can support a malicious prosecution claim. *See Williams*, 965 F.3d at 1158.

Additionally, although *Manners* analyzed a malicious prosecution claim stemming from a warrantless arrest, this Court ultimately concluded that the claim failed because the officer had probable cause to arrest the plaintiff. *Manners*, 891 F.3d at 969, 975. In any event, the precedent in *Wallace*, *McDonough*, *Nieves*, and *Kingsland* control, not *Manners*. *See also Williams*, 965 F.3d at 1159 (explaining how *Manners* relied on "the erroneous premise that a seizure without legal process . . . could sustain a claim of malicious prosecution").

We conclude that the district court erred in denying the Officers qualified immunity on the Martins' malicious prosecution claims because their warrantless arrests were on-the-spot seizures and without legal process.

## VI.    CONCLUSION

For the above reasons, we (1) affirm the denial of qualified immunity as to the Martins' false arrest and excessive force claims, (2) reverse the denial of qualified immunity as to the Martins' malicious prosecution claims, and (3) remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART.**