[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-12735
Non-Argument Calendar
_____

D.C. Docket No. 8:19-cv-00441-WFJ-SPF

JEANNE F. MARTELLI,

                                                    Plaintiff-Appellant,

versus

THOMAS KNIGHT,
DAVID TUCK,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 14, 2021)

Before MARTIN, BRANCH, and ED CARNES, Circuit Judges.

PER CURIAM:

Jeanne Martelli filed a lawsuit against Sheriff Thomas Knight and Detective David Tuck of the Sarasota County Sheriff's Department, asserting 42 U.S.C. § 1983 claims for false arrest and unreasonable seizure in violation of the Fourth and Fourteenth Amendments.  She also brought claims for false arrest under Florida law.  The district court granted summary judgment in favor of the defendants on her § 1983 claims and declined to exercise supplemental jurisdiction over her state law claims.[1]  This is her appeal.

I.

On November 18, 2016 Jeanne Martelli went out for a drink and came home late at night with a man she had met.  William Tillis, who was Martelli's current roommate and former boyfriend, became angry and threw the man out of the house.  Martelli and Tillis argued.  Their fight ended after she went to her room, grabbed her 9mm handgun out of the closet, loaded it with a magazine, chambered a round, and shot Tillis.

Each of them made separate calls to 911.  Martelli told an operator that she'd shot Tillis "because he was coming after [her], and [she was] done with him

---

[1] In her brief to this Court, Martelli has not challenged the district court's ruling on the state law claims.

coming after [her]." Tillis told an operator that Martelli had shot him, and he didn't know why. He could be heard repeatedly telling her to get away from him.

An ambulance took Tillis to the hospital, and Sarasota County Sheriff's Deputies took Martelli to the police station to interview her. During that interview, and after waiving her <u>Miranda</u> rights, she recounted her version of what happened the night of the shooting. After Tillis threw out the man Martelli had brought home, Tillis grabbed her and started shaking her. The two ended up in a "physical thing" in the living room and Martelli ended up on the floor. According to Martelli, Tillis did "that thing again where he just likes to grab you by the neck" and "just like shove[s] you." She described him trying to "smash [her] head into the [] ground" and told Detective Tuck that her head was sore from the impact. Tuck swore in an affidavit that he "checked her head but did not notice any cuts, scratches or swelling."

Martelli told Detective Tuck that she didn't remember exactly how she got away from Tillis but suggested "[t]here's a good chance one of [her] dogs stopped him." She was sure that after she got away, she ran to her bedroom, at which point she grabbed her 9mm pistol from her closet, loaded a magazine clip, and chambered a round. She told Tuck that she remembers telling Tillis to stop but doesn't "remember where [they] were [in the house] when [she] shot him."

3

Martelli described to Detective Tuck her history with Tillis. They had dated off and on since 2013. About a month after they started dating, Tillis was arrested and went to jail for beating Martelli and dragging her across the ground and also throwing her from a moving car. Martelli told Tuck about two occasions on which she had called the police while she and Tillis were fighting during the time they were living together in Fort Meyers. She said that both incidents "involved threatening, pushing, and shoving" but not Tillis hitting her or beating her up. Martelli also told Tuck that there were times she was afraid Tillis would kill her and that she told some of her friends that "if they did not hear from her that there was a good chance [Tillis] had killed her."

Tuck spent the next two weeks investigating the shooting. He interviewed neighbors and friends of Martelli and Tillis. He conducted a records check of past domestic dispute incidents between Tillis and Martelli. He interviewed Tillis twice. He reviewed the evidence collected at the scene, returned to the scene, and listened to the 911 tapes. He looked for, but could not find, the man Martelli had brought home with her.

After his investigation, Tuck decided that there was probable cause to arrest Martelli. He distilled his findings into a one-page affidavit and submitted it to a judge along with an application for an arrest warrant on the charge of aggravated

4

battery with a firearm. The affidavit described the shooting and who was involved in it. The affidavit mentioned Martelli's statement that she had been "battered" in an argument with Tillis before she shot him, but it went on to say that Martelli's statement Tillis had "battered" her wasn't consistent with the "examination of [Martelli's] body" Tuck conducted on the night of the shooting or "the condition of the residence." The affidavit also gave a brief, general summary of Tuck's interviews with Martelli and Tillis. Based on the affidavit, a Florida circuit judge found probable cause to charge Martelli with the crime of aggravated battery with a firearm and issued an arrest warrant. Martelli was arrested pursuant to that warrant.

After full discovery, the state attorney entered a nolle prosequi on August 9, 2017. And after that, Martelli filed this lawsuit.

## II.

Martelli contends that the district court erred by granting summary judgment in favor of Detective Tuck on her Fourth Amendment claim. The court determined that Tuck was entitled to qualified immunity because even if the warrant affidavit had included all the facts that supported Martelli's version of the events leading the shooting, there still would have been arguable probable cause to believe that the crime had been committed. See Paez v. Mulvey, 915 F.3d 1276, 1288 (11th Cir.

5

2019) ("Put another way, if the affidavits (including the omitted information) would have demonstrated even arguable probable cause — that a reasonable officer could have believed an offense was committed — then the officers are entitled to qualified immunity.").

We review de novo a grant of summary judgment based on qualified immunity. Cantu v. City of Dothan, 974 F.3d 1217, 1228 (11th Cir. 2020). To prevail on her Fourth Amendment claim, Martelli must establish that the arrest warrant was constitutionally infirm. To do that, she must first show that Tuck intentionally or recklessly omitted information in his warrant affidavit. See Paez, 915 F.3d at 1287. Normally, she would then be required to show that probable cause would be negated if the omissions were included. Id. But because this is a qualified immunity case, she must instead show that the "affidavit[] (including the omitted information) would [not] have demonstrated even arguable probable cause." Id. at 1288 (emphasis added). Arguable probable cause requires only that a reasonable officer in the same position with the same information as Tuck "could have believed that probable cause existed." Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010) (quotation marks omitted).

Detective Tuck's affidavit omitted some information favorable to Martelli, but even if we assume that those omissions were intentional or reckless, the claim

6

still fails. It fails because, even including all the omitted information, a reasonable officer in Tuck's position could have believed that there was probable cause. We will start by recounting the information that should have been included in the affidavit but wasn't, then discuss why there was arguable probable cause even when considering that information.

The affidavit omitted information about the mounting tension between Tillis and Martelli, Tillis' history of violence, certain facts about the night of the shooting, and Tillis' reliability as a witness. Though it generally described the who, when, and where of the shooting, the affidavit didn't describe the mounting tension between Martelli and Tillis in the lead-up to the shooting. At some point before the shooting, Martelli ended her dating relationship with Tillis. Even so, Tillis continued to refer to Martelli as his "wife." Martelli told Tillis she wanted to date other people, and the man she brought back to the house on the night of the shooting was the first man she had brought home since she had told Tillis that.

The affidavit also omitted Tillis' history of violence, a good deal of which involves Martelli. In 2013 Tillis was arrested and went to jail for beating and dragging Martelli to a car and then throwing her from that car while it was moving. During her interview after the shooting, Martelli told Tuck that she'd twice called the police on Tillis while they were living together. Both incidents "involved

7

threatening, pushing, and shoving" but not Tillis hitting her or beating her up. Martelli also told Tuck that there had been times she was afraid Tillis would kill her. And Tuck included none of that in the affidavit.

Detective Tuck also omitted from his warrant affidavit certain facts about the night of the shooting. In his first interview with Tuck, Tillis admitted that on the night of the shooting he had angrily confronted Martelli and the other man and that he had thrown the man out of the house "by the ear." Martelli told Tuck during her interview that her head hurt from when Tillis smashed it on the ground, and during the interview Tuck noticed a scratch on Martelli's arm. When asked about the scratch, Martelli didn't know where it came from.

The affidavit also fails to mention any concerns about Tillis' reliability as a witness. During his first interview with Detective Tuck, Tillis was confused about the time of the shooting, couldn't remember what he and Martelli had done that day, and made internally contradictory statements.

But for Martelli to defeat summary judgment, she must establish that the omissions were so material that had the information been included, Tuck would have lacked arguable probable cause. To determine whether she has done that, we examine all of the information omitted from the warrant affidavit together with all

of that included in it and ask whether the affidavit still establishes arguable probable cause. See Paez, 915 F.3d at 1287.

It does. Martelli doesn't dispute that she shot Tillis, nor does she dispute that fact alone meets the elements of Fla. Stat. § 784.045(2) (aggravated battery with a firearm). She instead argues that under Florida's Stand Your Ground law, she acted lawfully when she shot Tillis and that precludes arguable probable cause. We disagree.

Generally, an arresting officer need not consider the validity of a possible defense. See Baker v. McCollan, 443 U.S. 137, 145–46 (1979) ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, [including a] claim . . . based on . . . a defense such as lack of requisite intent."); see Manners v. Cannella, 891 F.3d 959, 971–72 (11th Cir. 2018) (citing Fridley v. Horrighs, 291 F.3d 867, 873 (6th Cir. 2002)); Pickens v. Hollowell, 59 F.3d 1203, 1207 (11th Cir. 1995) ("Whether the statute of limitations bars a prosecution is a question of law. The officers properly deferred legal decisions to the district attorney.") (quotation marks and emphasis omitted). The Sixth Circuit has held that an exception to that general rule exists if the arresting officer has actual knowledge of facts and circumstances that *conclusively* establish an affirmative defense. Estate of Dietrich

v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999).  Whether that exception applies has never been decided in a published opinion in this Circuit, and it's one we need not decide in this case because even if we assume that Tuck should have considered Florida's Stand Your Ground immunity when evaluating probable cause, it does not affect the outcome in this case.

Florida's Stand Your Ground law justifies the use of deadly force if the defendant "reasonably believes that using . . . such force is necessary to prevent imminent death or great bodily harm."  Fla. Stat. § 776.012(2).  "Self-defense is an affirmative defense that has the effect of legally excusing the defendant from an act that would otherwise be a criminal offense."  Garrett v. State, 148 So. 3d 466, 470 (Fla. 1st DCA 2014) (alterations omitted).  Florida law requires that "the threat faced . . . was imminent, in which case retreat would be futile and [the] use of deadly force would be justified."  See id. at 473; see also Fla. Stat. § 776.012(2).

There are several reasons a reasonable officer could have believed that the Florida law did not immunize Martelli from arrest.  After her physical altercation with Tillis on the night of the shooting, Martelli was able to leave the living room, go to her room, find and load a 9mm pistol, return to the hallway, and shoot Tillis.  That indicates that whatever danger Tillis posed to Martelli was not so imminent as to justify deadly force.  There's also the fact that Detective Tuck's observations of

10

the scene and Martelli's physical appearance did not, as he noted in his warrant affidavit, corroborate Martelli's description of the danger Tillis posed to her before she shot him. So even considering Florida's Stand Your Ground law and the facts excluded from the warrant affidavit along with those that were in the affidavit, a reasonable officer could have believed that probable cause existed to believe that Martelli had committed the crime of aggravated battery with a firearm.

The district court did not err in granting summary judgment in favor of Tuck on Martelli's Fourth Amendment claim.

III.

Martelli next contends that the district court erred in granting summary judgment on her claim against Knight in his official capacity as Sarasota County Sheriff. The court concluded that Martelli had abandoned the claim by failing to respond to any of Knight's arguments on summary judgment. We agree that she did.

In her response to Detective Tuck and Sheriff Knight's motion for summary judgment, Martelli argued that "Defendants failed to follow . . . Sarasota Sheriff's General Order 23.4 regarding domestic violence investigations." That is the only reference Martelli made to a policy or custom of the Sarasota County Sheriff's Office, and it argues against Martelli's position, not in favor of it.

11

There was no contention that General Order 23.4 is facially invalid as a constitutional matter, and none that Sheriff Knight showed deliberate indifference to any constitutional violations resulting from that policy. As a result, the district court did not err in finding that Martelli abandoned her claim against Sheriff Knight in his official capacity because she made no effort to argue that any municipal action by the sheriff was taken with deliberate indifference to her rights. See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997) ("[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.").

**AFFIRMED.**

12